GLENN D. POMERANTZ (State Bar No. 112503)
Glenn.Pomerantz@mto.com
JONATHAN E. ALTMAN (State Bar No. 170607)
Jonathan.Altman@mto.com
CAROLYN HOECKER LUEDTKE (State Bar No. 207976)
Carolyn.Luedtke@mto.com
PETER E. GRATZINGER (State Bar No. 228764)
Peter.Gratzinger@mto.com
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
Thirty-Fifth Floor
Los Angeles, CA 90071-1560
Telephone: (213) 683-9100
Facsimile: (213) 687-3702

Attorneys for Defendants
AMERICAN BROADCASTING COMPANIES,
INC., THE WALT DISNEY COMPANY, DISNEY
ENTERPRISES, INC., ABC, INC., dba DISNEY/ABC
TELEVISION GROUP, KEEP CALM AND CARRY ON
PRODUCTIONS, INC.

(*Additional counsel listed on signature page*)

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| CBS Broadcasting Inc.,<br><br>        Plaintiff,<br><br>vs.<br><br>American Broadcasting Companies, Inc., et. al.,<br><br>        Defendants. | CASE NO. CV 12-04073 GAF (JEMx)<br><br>**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO CBS BROADCASTING INC.'S *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER**<br><br>**REDACTED PUBLIC VERSION**<br><br>[Declarations of Kenny Rosen, Corie Henson, Jeffrey Bader, Jill Gershman, Timothy Bock, Debbie Anderson, Lynn Spiegel, Benjamin Hodges, and Carolyn Hoecker Luedtke filed concurrently herewith; [Proposed] Order lodged concurrently herewith]<br><br><u>Hearing</u><br>Date:      none set<br>Time:      none set<br>Place:     Courtroom No. 740<br>Judge:    Hon. Gary A. Feess |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................. 1

II. BACKGROUND ................................................................. 3

III. ARGUMENT ................................................................. 5

    A. CBS's Claims Of Copyright Infringement Will Not Succeed .............. 5

        1. CBS Fails To Demonstrate Substantial Similarity Under The Extrinsic Test ........................................................ 6

            a. The Rules Of *Big Brother* ................................. 7

            b. The Rules Of *The Glass House* ...................... 8

        2. CBS's Attempt To Claim Copyright In The Selection And Arrangement Of Unprotectable Elements Fails ...................... 13

    B. CBS's Trade Secret Claims Are Unlikely To Succeed On The Merits ................................................................. 17

        1. CBS Has Not Identified Any Secret Aspect Of The House Guest Manual Or Any Meaningful Use .................................. 17

        2. CBS's Remaining Claimed Trade Secrets Are Frivolous ........ 20

        3. CBS Has Not Shown Reasonable Efforts To Maintain Secrecy ................................................................. 21

        4. The Scope Of CBS's Injunctive Relief On The Trade Secret Claim Is Impermissibly Broad .................................. 21

    C. CBS Has Not Established That It Will Suffer Irreparable Harm ....... 22

    D. The Balance of Hardships Tips Sharply In Favor Of ABC ............... 23

    E. There Is No Basis For An Injunction Based On Alleged Spoliation ................................................................. 25

IV. CONCLUSION ................................................................. 25

DEFENDANTS' OPPOSITION TO CBS'S
*EX PARTE* APPLICATION FOR TRO,
CV 12-04073

# TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*Benay v. Warner Bros. Entm't, Inc.*,
   607 F.3d 620 (9th Cir. 2010) ................................................................ 6

*BensBargains.net, LLC v. XPBargains.com*,
   No. 06-cv-1445, 2007 WL 2385092 (S.D. Cal. Aug. 16, 2007) ......................... 5

*Berster Tech., LLC v. Christmas*,
   No. S-11-1541, 2012 WL 33031 (E.D. Cal. Jan. 6, 2012) ............................... 23

*Bethea v. Burnett*,
   No. CV04-7690, 2005 WL 1720631 (C.D. Cal. 2005) ............................ 6, 7, 10

*CBS Broadcasting, Inc. v. ABC, Inc.*,
   No. 02 Civ. 8813, 2003 U.S. Dist LEXIS 20258 (S.D.N.Y. Jan. 14, 2003),
   ..................................................................................... 1, 15, 16

*Funky Films, Inc. v. Time Warner Entm't. Co.*,
   462 F.3d 1072 (9th Cir. 2006) ................................................................ 6

*Goldblum v. Nat'l Broadcasting Corp.*,
   584 F.2d 904 (9th Cir. 1978) ............................................................... 24

*Harper House, Inc. v. Thomas Nelson, Inc.*,
   889 F.2d 197 (9th Cir. 1989) ............................................................... 17

*Kouf v. Walt Disney Pictures & Television*,
   16 F.3d 1042 (9th Cir. 1994) ................................................................ 6

*Litchfield v. Spielberg*,
   736 F.2d 1352 (9th Cir. 1984) ............................................................. 16

*Metcalf v. Bochco*,
   294 F.3d 1069 (9th Cir. 2002) ........................................................ 14, 17

*Metromedia Broadcasting Corp. v. MGM/UA Entertainment Co., Inc.*,
   611 F. Supp. 415 (C.D. Cal. 1985) ....................................................... 22

*Milano v. NBC Universal, Inc.*,
   584 F. Supp. 2d 1288 (C.D. Cal. 2008) ............................................. passim

- ii -

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page(s)**

3

*Nichols v. Universal Pictures Corp.*,

4
    45 F.2d 119 (2d Cir. 1930) ................................................................ 16

5

*Nintendo of America, Inc. v. Lewis Galoob Toys, Inc.*,

6
    16 F.3d 1032 (9th Cir. 1994) ........................................................... 25

7

*North American Lubricants Co. v. Terry*,
    No. CV-11-1284, 2011 WL 5828232 (E.D. Cal. Nov. 18, 2011) .................... 18

8

9

*O2 Micro Int'l Ltd. v. Monolithic Power Systems, Inc.*,
    399 F. Supp. 2d 1064 (N.D. Cal. 2005) ............................................ 22

10

11

*OG Int'l, Ltd. v. Ubisoft Entertainment*,
    No. 11-04980, 2011 WL 5079552 (N.D. Cal. Oct. 26, 2011) .................... 23, 24

12

*Religious Tech. Center v. Netcom On-Line Commc'n Servs., Inc.*,

13
    907 F. Supp. 1361 (N.D. Cal. 1995) ............................................... 24, 25

14

*Rice v. Fox Broadcasting Co.*,

15
    330 F.3d 1170 (9th Cir. 2003) .......................................................... 5, 6

16

*Sampson v. Murray*,

17
    415 U.S. 61 (1974) ................................................................... 22

18

*Struthers Scientific & Int'l. Corp. v. General Foods Corp.*,

19
    51 F.R.D. 149 (D. Del.1970) ......................................................... 18

20

*Stuhlbarg Int'l Sales Co. v. John D. Krush & Co., Inc.*,
    240 F.3d 832 (9th Cir. 2001) ......................................................... 22

21

22

*TMTV, Corp. v Mass Productions, Inc.*,
    645 F.3d 464 (1st Cir. 2011) ...................................................... 16, 17

23

*Winter v. Natural Res. Def. Council, Inc.*,

24
    555 U.S. 7 (2008) ................................................................. 5, 22, 24

25

*Zella v. E.W. Scripps Co.*,

26
    529 F. Supp. 2d 1124 (C.D. Cal. 2007) ......................................... 6, 14, 17

27

28

17686214.1
    - iii -
    DEFENDANTS' OPPOSITION TO CBS'S
*EX PARTE* APPLICATION FOR TRO,
CV 12-04073

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

**STATE CASES**

*Edwards v. Arthur Andersen LLP,*
    44 Cal. 4th 937 (2008)......................................................................... 24

*FLIR Systems Inc. v. Parrish,*
    174 Cal. App. 4th 1270 (2009) .......................................................... 22

*Perlan Therapeutics, Inc. v. Superior Court,*
    178 Cal. App. 4th 1333 (2009)........................................................... 18

*Whyte v. Schlage Lock Co.,*
    101 Cal. App. 4th 1443 (2002)..................................................... 20, 21

**STATE STATUTES**

Cal. Bus. & Prof Code § 16600 .................................................................. 4

Cal. Civ. Code 3426.1................................................................................ 21

Cal. Civ. Code. 3426.1(d).......................................................................... 21

**FEDERAL RULES**

Fed. R. Civ. P. 65(c) ................................................................................. 25

**TREATISES**

Nimmer on Copyright § 13.03[D] (2007) ................................................... 5

DEFENDANTS' OPPOSITION TO CBS'S
*EX PARTE* APPLICATION FOR TRO,
CV 12-04073

# I.    **INTRODUCTION**

Ten years ago, CBS tried and failed to stop the broadcast of an ABC reality show it regarded as competitive with *Survivor. CBS Broadcasting, Inc. v. ABC, Inc.,* No. 02 Civ. 8813, 2003 U.S. Dist LEXIS 20258 (S.D.N.Y. Jan. 14, 2003), at *42 ("*CBS I*") (rejecting motion for preliminary injunction because reality show "*I'm A Celebrity, Get Me Out Of Here!*" was not substantially similar to *Survivor*). Today, CBS renews its effort to suppress competition in the reality show genre with its mirror-image effort to enjoin *The Glass House,* scheduled to premiere on Monday, June 18, 2012.   CBS invites this Court to become the nation's first tribunal to enjoin broadcast of a reality television show – as well as the first to enjoin *any* television show based on a theory of *possible* copyright infringement, without any showing of substantial similarity under governing Ninth Circuit authority.   CBS also seeks a wholly unprecedented restraining order based on the alleged misappropriation of processes and techniques already well known to everyone who has ever worked in reality television.   Defendants respectfully ask this Court to deny CBS's *ex parte* application for a temporary restraining order.

*First*, CBS's copyright claim will not succeed on the merits.   CBS carefully avoids conducting the substantial similarity analysis required to demonstrate copyright infringement pursuant to controlling Ninth Circuit authority.   And for good reason – CBS cannot satisfy the Ninth Circuit's objective "extrinsic test."   As CBS and its expert tacitly admit, none of the alleged similarities shared by *Big Brother* and *The Glass House* involve copyright protectable elements – they are all generic staples of the reality show genre: people living in a house, competing with each other to avoid elimination, and winning a prize.   Nor is the sequence and arrangement of these unprotectable elements the same in *Big Brother* and *The Glass House,* foreclosing the possibility of infringement.

*Second*, CBS asks this Court to believe that *Big Brother* has some "secret process" of television production that nobody else has and that Defendants

1  somehow tried to gain access to that "secret process" by hiring people with
2  experience on *Big Brother*. This grand theory has many flaws. To begin, there is
3  no "secret sauce" in *Big Brother's* production process. The processes outlined in
4  CBS's brief and attached Appendix describe commonly known equipment, jobs,
5  and ways of doing things in reality television production. Indeed, consistent with
6  this, CBS concedes that it gives tours of its *Big Brother* set (including to journalists
7  who write about the production process) and it even opens the *Big Brother* set to
8  the public through a You Tube video in which the *Big Brother* executive producer
9  walks the viewer through the set, master control room, and other aspects of the *Big*
10  *Brother* production process.

11      In addition, there was no conspiracy to hire away *Big Brother* employees. To
12  the contrary, in reality television production, nearly everyone works as a freelancer
13  moving from show to show, network to network. Workers often follow a show-
14  runner (like Kenny Rosen, *The Glass House's* show-runner) with whom they like
15  working. Similarly, show-runners like hiring familiar people that they know will
16  do a good job. That is what happened here. A group of employees followed Mr.
17  Rosen from *Big Brother* (where he last worked in 2007) to *Hell's Kitchen* at Fox,
18  and then to *The Glass House*. It had nothing to do with *Big Brother's* so-called
19  secret processes. Instead, it had to do with personal relationships and experience.

20      The hardship analysis also weighs against an injunction. Any alleged harm
21  to CBS is measurable through lost viewers and revenue, and thus compensable with
22  money damages. In contrast, it would cause significant harm if this Court
23  postponed ABC's innovative new show after voting for contestants by the public
24  has already commenced, after ABC spent $16 million to promote a June 18
25  premiere, and after ABC gave *The Glass House* prime real estate in ABC's summer
26  schedule after *The Bachelorette*. A temporary restraining order, even for a week,
27  would seriously undermine the show's potential success.

28

DEFENDANTS' OPPOSITION TO CBS'S
*EX PARTE* APPLICATION FOR TRO,
CV 12-04073

## II.     BACKGROUND

*The Glass House* is ABC's new reality series that lets viewers "take control" of the contestants.  It is designed to bring the interactivity of the internet, Facebook and Twitter into the reality show context, letting viewers dictate what happens in the house and who is eliminated.  For example, this weekend, you could watch biographical videos of each of the contestants on the Internet and vote on who should be allowed to stay in the house after the first episode next week.  Viewers also voted on which contestants would sleep together in the "friends room," who would sleep in the "enemies room," and who would share the common bedrooms. *See generally* Declaration of Kenneth Rosen ("Rosen Decl.") ¶¶ 3 - 15.

Reality television is, of course, a popular and growing genre of television programming.  *See* Expert Report of Lynn Spigel ("Spigel Report") at 7-10 (history and description of reality television genre).  *The Glass House* will be a part of this genre.  It will feature real people competing in an unscripted production.  As with other popular shows like *The Biggest Loser*, *The Apprentice*, and *Hell's Kitchen*, the contestants will live together in relatively close quarters, with cameras rolling all the time to capture the human drama as it unfolds.  *See id.* at 9-10 (describing advent of "social experiment" reality game shows of this type).  As viewers have come to expect on shows like *Survivor*, contestants on *The Glass House* will compete in teams against one another and the winning team will receive protection from elimination.  The competitions will involve skill, strategy, and hopefully will be entertaining.  Unlike shows like *Big Brother* and *Survivor*, the viewing public will have an opportunity to vote on who is eliminated each week on *The Glass House*, similar to, for example, *American Idol* and *Dancing With the Stars*.  This voting process likely will lead contestants to campaign for America's votes in the show's "confessional" as well as through their actions, as the young singers do on *American Idol*.  Someone will be eliminated each week until the last person standing wins a prize, just as in *The Apprentice* (where the prize is a job), *The*

*Bachelor or Bachelorette* (where the prize is love, and a ring), and *Survivor* (where the prize is cash).

*The Glass House* is set to premiere on the ABC network on June 18.  ABC has spent more than $16 million to promote the show and scheduled it in the highly coveted 10:00 p.m. Monday time slot after *The Bachelorette*.  *See* Declaration of Jeff Bader ("Bader Decl.") ¶ 7; Declaration of Jill Gershman ("Gershman Decl.") ¶ 3-4.  The 14 contestants have given up their jobs and moved to Los Angeles.  *See* Declaration of Debbie Anderson ("Anderson Decl.") ¶ 3.  Today, *The Glass House* reality show began – contestants moved into the house, met each other for the first time, and started building relationships and strategies for how to convince America to vote for them.  *See* Rosen Decl. ¶ 57.

There are approximately 145 people working on the production of *The Glass House* from Keep Calm and Carry On Productions ("Keep Calm")*,* the vast majority of whom are hired on a daily or weekly basis.[1]  *See* Declaration of Timothy Bock ("Bock Decl.") ¶¶ 4-6.  If an injunction issues, these employees are likely to lose their jobs, at a time when it is likely too late to pick up another freelancing job in reality television for the summer.  *See id.*

It is true that some of these people have experience working on *Big Brother*, but CBS's accusation that key staff was "poached" from *Big Brother* is irrelevant; it is legal to hire staff from a competitor.[2]  Moreover, there was no poaching.  Two of the three top former *Big Brother* employees have not worked on *Big Brother* for many years.  Henson Decl. ¶ 2, Rosen Decl. ¶ 2.  They were not stolen away from *Big Brother*.  To the contrary, Ms. Henson was only employed by *Big Brother* for

---

[1] CBS asserts that "half" of *The Glass House* staff previously worked on *Big Brother*.  This is based on Mr. Rosen's mistaken approximations of the total staff on *The Glass House*.  Keep Calm employs 145 people on *The Glass House*, and this does not take into account the additional number of ABC employees who work on *The Glass House*, among other shows.  *See* Bock Decl. ¶ 4.

[2] With rare exception not applicable here, businesses may not restrain the movement of their workers, and attempts to do so are typically void as a matter of public policy.  *See* Cal. Bus. & Prof Code § 16600.

DEFENDANTS' OPPOSITION TO CBS'S
*EX PARTE* APPLICATION FOR TRO,
CV 12-04073

1    two summers in 2005 and 2006, and she has been a full time ABC executive since

2    2008.  *See id.*  Similarly, Mr. Rosen has not worked for *Big Brother* since 2008.

3    Mr. Rosen worked more recently on *Hell's Kitchen* for Fox and he brought more

4    employees with experience on *Hell's* Kitchen to *The Glass House* than those with

5    experience on *Big Brother*.  *See* Edelman Decl. Ex. A (Depo. at 260:2-5).  In fact,

6    Mr. Rosen testified that of *The Glass House* people he works with who have *Big*

7    *Brother* experience, most worked with him more recently on *Hell's Kitchen*.  *See*

8    *id.* at 259:1-5.  Employee mobility is the norm, not the exception, in reality TV.

9    **III.   ARGUMENT**

10        The burden is on CBS to establish that it "is likely to succeed on the merits,

11   that [it] is likely to suffer irreparable harm in the absence of preliminary relief,

12   that the balance of equities tips in [its] favor, and that an injunction is in the public

13   interest."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  CBS

14   does not meet its burden.

15           **A.   CBS's Claims Of Copyright Infringement Will Not Succeed**

16        To establish copyright infringement, a plaintiff must prove (1) ownership of a

17   valid copyright, and (2) copying.  "The latter element may be established by

18   showing that the works in question are substantially similar in their protected

19   elements and that the infringing party had access to the copyrighted work."  *Rice v.*

20   *Fox Broadcasting Co.,* 330 F.3d 1170, 1174 (9th Cir. 2003) (internal quotation

21   marks and citation omitted).

22        Because no dispute regarding access exists here, CBS's claim hinges on its

23   ability to demonstrate substantial similarity.[3]  "To determine whether two works are

24   _____

     [3] CBS argues that the so-called "unprecedented poaching" of former *Big Brother*
25   staffers helps with CBS's infringement case because it shows a "high level" of
     access.  Mem. at 13-14.  CBS's "poaching" charge is nonsense, and CBS has been
26   broadcasting *Big Brother* on television *for 13 seasons*.  Everyone in America has all
     the access they could possibly have to *Big Brother*'s expressive elements.
27   However, "access logically exerts no impact on copying as a legal matter."
     *BensBargains.net, LLC v. XPBargains.com*, No. 06-cv-1445, 2007 WL 2385092, at
28   *3 (S.D. Cal. Aug. 16, 2007). (quoting Nimmer on Copyright § 13.03[D] (2007)).
     "[E]ven if access is present," CBS "cannot state a claim if substantial similarity is

1   substantially similar, a two-part analysis – an extrinsic test and an intrinsic test– is

2   applied." *Id.*  A plaintiff must satisfy both tests to demonstrate infringement.

3   *Benay v. Warner Bros. Entm't, Inc.,* 607 F.3d 620, 624 (9th Cir. 2010).  The

4   extrinsic test objectively measures the "articulable similarities" between the works'

5   (1) plot, (2) theme, (3) dialogue, (4) mood, (5) setting, (6) pace, (7) characters, and

6   (8) sequence of events.  *Milano v. NBC Universal, Inc.,* 584 F. Supp. 2d 1288, 1294

7   (C.D. Cal. 2008).

8        To apply the extrinsic test, courts "inquire only whether the *protect[a]ble*

9   *elements, standing alone,* are substantially similar." *Id.* at 1294 (emphasis in

10  original).  The court "filters" unprotectable elements out of its analysis, including

11  elements from another author or the public domain, scenes a faire, and instances in

12  which a particular expression merges with its expression.  *Bethea v. Burnett*, No.

13  CV04-7690, 2005 WL 1720631, at * 10 (C.D. Cal. 2005).[4]

### 1.    CBS Fails To Demonstrate Substantial Similarity Under The Extrinsic Test

14
15       Here, there is quite literally *no* substantial similarity in protectable elements

16  under the extrinsic test, as shown in the expert declaration of Professor Spigel.

17  Professor Spigel conducts a through analysis of the reality genre and of the two

18  programs at issue, concluding that they are "different in their themes and premises;

19

20  lacking." *Zella v. E.W. Scripps Co.*, 529 F. Supp. 2d 1124, 1133 (C.D. Cal. 2007).
    In fact, "[e]ven if a defendant concedes use of a plaintiff's work, the copyright
21  claim still fails absent substantial similarity." *Id.  See Funky Films, Inc. v. Time
    Warner Entm't. Co.,* 462 F.3d 1072, 1076, 1081-82 (9th Cir. 2006) (summary
22  judgment granted for defendants based on lack of substantial similarity where
    defendants conceded access); *Kouf v. Walt Disney Pictures & Television,* 16 F.3d
23  1042, 1044 n.2, 1045 (9th Cir. 1994) (same); *Zella,* 529 F. Supp. 2d at 1133, 1139
    (same).

24  [4] The intrinsic test "focuses on 'whether the ordinary, reasonable audience' would
    find the works substantially similar in the 'total concept and feel of the works.'"
25  *Benay,* 607 F.3d at 624 (citation omitted).  The intrinsic test remains the exclusive
    province of the jury.  Courts have authority to consider the extrinsic test. *Milano,*
26  584 F. Supp. 2d at 1294-95 & n.4.  Here, there is no work to examine, so it
    becomes near impossible to apply the intrinsic test, except to say that the significant
27  differences in the production values and look of *The Glass House,* and the
    differences in the contest structure, indicate that the two shows have a different
28  "total concept and feel."

- 6 -                              DEFENDANTS' OPPOSITION TO CBS'S
                                                                              *EX PARTE* APPLICATION FOR TRO,
                                                                              CV 12-04073

1  settings; character relationships; dynamics between viewers and players, use of
2  interactive features; and their game rules and related sequence of plot events." *See*
3  Spigel Report at 3.

4      The utter failure of CBS's expert, Jeffrey Rovin, to perform a satisfactory
5  extrinsic test only confirms Professor Spigel's opinion that *Big Brother* and *The*
6  *Glass House* are not substantially similar.  Indeed, CBS barely references the
7  extrinsic test in its briefing.  Below, with annotations, is the totality of Mr. Rovin's
8  extrinsic test analysis:

9      "**PLOT:  House guests compete for privileges and a grand prize while**
10  **risking expulsion.**"  Edelman Decl. Ex. B (hereinafter "Rovin Report") at 24.

11      Obviously, Mr. Rovin has not described a plot.  There is some question
12  whether he has even described an *idea* for a plot.   Assuming he has, the idea for a
13  plot is not protectable. *See Bethea,* 2005 WL 1720631, at *11 ("[T]his degree of
14  similarity between the basic plots of two works cannot sustain a plaintiff's claim
15  that the works are substantially similar.  No one can own the basic idea for a
16  story.").

17      In fact, like all reality programming, neither *Big Brother* nor *The Glass*
18  *House* have a "plot as that term is normally used." *Milano,* 584 F. Supp. 2d at
19  1296.  Instead, both programs have a "'contest structure' from which "a 'plot'
20  emerges as the participants, through the dynamic of the game, reveal their character
21  and begin to assume specific roles." *Id.*

22      One would hardly suspect this from reading Mr. Rovin's report.  He never
23  mentions the rules of *Big Brother* or *The Glass House*.  And for good reason: the
24  two contests have completely different rules, which necessarily means the plot that
25  emerges through the dynamic of the contest must be very different.

26              **a.      The Rules Of *Big Brother***

27      In *Big Brother*, 12 to 14 contestants must generally compete head-to-head
28  with each other in game-show like challenges to become Head of Household.  The

1  Head of Household has the power to nominate two contestants for eviction from the

2  house.  On the second episode of the week, contestants play to win the Power of

3  Veto, which can "save" one of the two contestants eligible for eviction.  If the

4  winner of the Power of Veto uses his or her veto, the Head of Household must then

5  nominate a different contestant for eviction to take the saved player's place.  The

6  contestants then vote on which of the two players eligible for eviction will actually

7  leave the house.  The last person remaining in the house wins a cash prize.  Spigel

8  Report at 17.

9            **b.      The Rules Of *The Glass House***

10            Although *The Glass House* does not yet exist in a fixed form, as of now, the

11  rules provide that the viewing public will elect two captains in the house each week

12  (other than the first week).  These will be the two *least* popular contestants during

13  any given week.  The two team captains will then "choose up" two teams from the

14  remaining contestants "schoolyard-style," one captain choosing one contestant for

15  his or her team, then the other captain choosing another member, until no more

16  contestants remain.  The two teams will then engage in physical and mental

17  competition against each other.  *See* Rosen Decl. ¶ 5.

18            The losing team captain goes to "limbo" – *i.e.,* out of the house.  In addition,

19  all contestants vote on a second member of the losing team to send to limbo.  The

20  viewing audience then votes one of the two contestants dwelling in limbo back into

21  the house.  The other contestant in limbo is permanently eliminated from the game.

22  *See id.* ¶ 6.

23            The game continues in this way until the tenth and last episode of the season.

24  In the final episode, the winner of *The Glass House* will be determined based on a

25  combination of the viewing audience's votes and the contestants' performance in

26  one or more challenges.

27            In addition to the decisions described above, viewers also control aspects of

28  the contestants' lives in the house when *The Glass House* streams on the Internet

DEFENDANTS' OPPOSITION TO CBS'S *EX PARTE* APPLICATION FOR TRO, CV 12-04073

1    three times a week for seven hours in total.  As is immediately apparent, unlike *Big*

2    *Brother*, viewers of *The Glass House* do not simply watch the show, they play the

3    game and judge the players.  Unlike *Big Brother,* and more like *American Idol* and

4    *Dancing With the Stars*, the viewers' judgments drive the game.  *Big Brother*

5    houseguests are free to behave as seems best to them, no matter how their conduct

6    might look to the viewers; *The Glass House* contestants know that their conduct has

7    consequences, which the unseen power of the viewing audience may inflict on them

8    in the form of voting them into limbo or off the show altogether, or putting them in

9    less comfortable surroundings.  Conversely, the viewing audience can also help

10   their favorite players, by saving them from limbo, giving them better food, and so

11   on.  In short, you cannot win *The Glass House* if you cannot win over the most

12   important player of all – the viewers.

13          Because *The Glass House* game has not begun, and ABC has neither

14   broadcast nor recorded any episodes prior to today, no one can say for sure how

15   *The Glass House*'s different "contest structure" will affect its "plot," except to

16   observe that because the audience is the one ally every contestant needs in *The*

17   *Glass House,* while in *Big Brother* audience participation and power remain

18   minimal, the "plots" of the two shows will almost certainly differ significantly.

19          **"CHARACTERS:  There are a dozen or so persons of varied gender,**

20   **age, and ethnicity who interact as team mates and opponents; home viewers**

21   **influence their fate in ways large and small. Invariably, there are contestants**

22   **who are natural leaders and others who are natural whiners.**  Rovin Report

23   at 24.

24          First, Mr. Rovin's observation that each program generally features a dozen

25   persons of varied gender, age, and ethnicity who interact as teammates and

26   opponents, some of whom are natural leaders and other of whom are "whiners,"

27   cannot possibly support a finding of substantial similarity.  As Judge Walter

28   explained in analogous circumstances, "[t]he fact that each program generally seeks

DEFENDANTS' OPPOSITION TO CBS'S
*EX PARTE* APPLICATION FOR TRO,
CV 12-04073

1  a 'group of dynamic contestants from varied backgrounds' is not only not original

2  to Plaintiff . . ., it is a staple of the reality television genre.  Such 'stock elements'

3  are not protectable and should not be considered in evaluating substantial

4  similarity."  *Bethea,* 2005 WL 1720631, at *12.

5       Second, Mr. Rovin is being disingenuous when he writes, "home viewers

6  influence [the characters'] fate in ways large and small."  Rovin Report at 24.  In

7  fact, his statement may be more accurately recast: "home viewers influence *The*

8  *Glass House* characters' fate in ways large, and the *Big Brother* characters' fate in

9  ways small."  With the exception of the first season, and of four isolated instances

10  throughout *Big Brother*'s 13-year run, *Big Brother* viewers have had minimal

11  influence on who wins or loses *Big Brother.*  In contrast, the very idea and concept

12  of *The Glass House* is that viewers will control all essential aspects of the game.

13       As this Court has previously noted, "because reality shows do not involve

14  fictional characters[, c]haracter is developed entirely through the dynamic

15  interaction of the contestants over the course of the program."  *Milano,* 584 F.

16  Supp. 2d at 1297.  Here, the two programs encourage different character traits: on

17  the one hand, *Big Brother* rewards a certain amount of strategic behavior, even

18  duplicity; on the other hand, in *The Glass House,* the viewing audience may make

19  duplicity a costly or even ineffective strategy if it so chooses.  As of now, it remains

20  to be seen exactly how the voting by the viewers will affect *The Glass House*

21  characters, but it seems likely the different rules and playing environment of *The*

22  *Glass House* and *Big Brother* will result in different character choices and

23  interactions.   Beyond that, it is worth noting that the "characters" at issue are real

24  people – real people are never substantially similar.

25       In addition, *Big Brother* has one character without any analogue in *The Glass*

26  *House* – Julie Chen, the host.  Ms. Chen plays a significant role in *Big Brother*'s

27  narrative/plot structure, and has a distinct role in relation to the contestants.  She is

28  often associated with "Big Brother" when she appears on the TV in the living room

- 10 -

giving contestants instructions, and she conducts interviews with evicted contestants on the live show.  In contrast, *The Glass House* has no host.  Spigel Report at 15.

**THEMES:  Both shows are about trust, betrayal, ambition, disappointment, bonding, competitiveness, and affection.**  Rovin Report at 24.

So is Shakespeare.  Mr. Rovin might as well be describing the theme of Greek tragedy or the *Die Hard* movies.  Obviously, this type of "analysis" has no bearing on substantial similarity.

ABC's promotional website aptly summarizes the theme of *The Glass House*: "Tell Me What To Do."  *See* Luedtke Decl. Ex. C; Spigel Report at 15. Again, the animating principle of *The Glass House* is that the viewers control the game and to some extent the player's conduct.  This differentiates *The Glass House* from *Big Brother*.  *Id.* at 15-16.  Although much reality television has interactive components, and some use chat boards, contestant blogs, and audience voting, Defendants can think of no other show that presents itself first and foremost as a reality competition involving the viewer.  The integration of social media, and the viewer capacity to help (or hinder) the contestants on an ongoing basis takes audience interaction to a new level.

**MOOD:  Tension and paranoia are magnified in the confines of the house and increase as the finale nears.**  Rovin Report at 24.

This observation is common to any reality show in which players compete in an elimination tournament for an important prize.  Increased tension toward the end of an intense contest is scenes a faire – it always happens and the very premise requires it.

**DIALOGUE:  There are no scripts, just improvisation.  Since the participants are not professional actors, the dialogue on Big Brother is colloquial and conversational.**  Rovin Report at 24.

1   This is true of every reality show, and nearly every documentary.  *See*

2 *Milano,* 584 F. Supp. 2d at 1297 (dialog factor "is not relevant to reality

3 programming").

4   **SETTING:  A generally comfortable, cloistered, house environment**

5 **extensively wired for video and audio eavesdropping. There is ample room for**

6 **extravagant, at times outlandish competitions.**  Rovin Report at 24.

7   The settings of *Big Brother* and *The Glass House* are similar at the highest

8 level of abstraction in that they both take place in houses on soundstages.  It is also

9 true that both houses are wired for sound and audio, but that is where the

10 similarities end.  *See* Spigel Report at 12-14 (detailed comparison of the houses in

11 *The Glass House* and *Big Brother*).  Of course, setting a reality show in a house is

12 common, as seen in *The Biggest Loser* and *The Bachelor, among many others*.  *See*

13 Spigel Report at 20.

14   The house in *The Glass House* is ultra- modern, and includes a trap door

15 style elevator near the video wall that drops players into "limbo."  It is one story,

16 and made of glass.  The *Big Brother* house is much less modern in design, has two

17 stories, and does not have glass walls. It has no elevator in the center of the house,

18 nor does it have the same type of video wall as does *The Glass House*.  Although

19 Mr. Rovin claims the settings are strikingly similar because both houses have a

20 living room with a television screen, as well as a bar, these are features of hundreds

21 of thousands of American homes, as well as stock features of TV shows that takes

22 place in a home.

23   **PACE:  With dozens of cameras available for back-and-forth cutting,**

24 **Big Brother moves quickly through its mix of soap opera and splashy contests.**

25 **The promotional materials suggest that Glass House will be identical**.  Rovin

26 Report at 24.

27   It is too early to say anything definitive about the pace of *The Glass House*

28 because the show has not aired, and indeed, Mr. Rovin does not do so, arguing that

he *thinks* the pace of *The Glass House* will be similar.  In fact, the converse is likely true.  *Big Brother* airs three times a week, and eliminates a player every third episode, allowing a much more leisurely dramatic pace than is possible in *The Glass House,* which airs once a week and *each episode* must contain all the events leading to two players' exile to limbo.

**SEQUENCE OF EVENTS: Big Brother moves from chit-chat and down-time to wild competitions with house guests being ousted on a regular basis.  This is repeated until only the winner remains.**  Rovin Report at 25.

Again, Mr. Rovin prefers to dwell at very high levels of abstraction, because that is the only place where he is safe.  The moment one considers the actual rules of the two games at issue, it becomes unavoidably clear that the sequence of events, like the plot, will be very different in the two shows because the rules of the games are very different.  *Big Brother* broadcasts three one-hour episodes each week in which to show the Head of Household competition, the Power of Veto competition, nominations for eviction, and the actual eviction.  This sequence of events mandated by the *Big Brother* game differs substantially from *The Glass House*'s one-hour, all-in-one-episode selection of team captains, the team competitions, and the losing captain's and team member's exile to limbo.

Mr. Rovin's paper-thin analysis of the extrinsic test does not come close to demonstrating substantial similarity under governing Ninth Circuit authority.  Absent a showing of substantial similarity, CBS's copyright claim fails.

**2.     CBS's Attempt To Claim Copyright In The Selection And Arrangement Of Unprotectable Elements Fails**

Nor can CBS save its infringement claim by claiming copyright in the "selection and arrangement" of generic reality show elements.  CBS relies on a list of generic elements like monitoring contestants with cameras, 12 to 14 people living in a house cut off from the outside world but visible to it, competing in

1  challenges to earn privileges or penalties, voting one another off the show, and

2  winning a prize.  *See* Mem. at 14:9-21.

3       None of these so-called similarities can support a claim of copyright

4  infringement.  They are plainly unprotectable ideas – indeed, extremely

5  commonplace ideas in the landscape of reality television today.  *See* Spigel Report

6  at 7-10.  When a successful reality show develops a good idea, other shows observe

7  that idea and incorporate it into their own show.  Television producers aim to give

8  America what America likes.  *American Idol* popularized the idea of America

9  voting on contestants in a competition, inspiring *The Voice*, *The X Factor*, and

10  others.  The same holds true for the host of weight-loss shows (as described in

11  *Milano,* 584 F. Supp. 2d at 1296), dancing shows (like *Dancing with the Stars* and

12  *So You Think You Can Dance?*), fashion design shows (like *Design Star* and

13  *Project Runway*), and home makeover shows (like *Extreme Makeover: Home*

14  *Edition* and *Trading Spaces*).  If inspiring the improvement and development of

15  other television shows with a clever idea is copyright infringement, then reality

16  television itself – indeed, *all* of television (with its hospital shows, police shows,

17  friends-in-an-apartment shows ) would infringe.  This is not, and could not be, the

18  law.  *See Milano*, 584 F. Supp. 2d at 1293-94 ("[c]opyright law does not protect

19  ideas").

20       Recognizing this, CBS argues that "[r]egardless whether [these] individual

21  elements of *Big Brother* are protectable expression or not, they are individually

22  protected if they are 'selected, coordinated, or arranged . . . in an original way'"[5]

23  Mem. at 15 (citation and emphasis omitted).); *see Metcalf v. Bochco,* 294 F.3d

24  1069, 1074 (9th Cir. 2002) (recognizing possibility of "selection and arrangement"

25  claim).

26  _____

[5] CBS misstates the rule.  Unprotectable elements do not gain *individual* protection
when selected and arranged in a copyrightable form; the selection and arrangement

27  obtains protection.  *See, e.g. Zella,* 529 F. Supp. 2d at 1132-38 (particular sequence
may be protectable, even where individual elements of the sequence are not

28  protectable).

CBS makes precisely the same argument rejected in *CBS I,* 2003 U.S. Dist LEXIS 20258 at *42.  In *CBS I*, virtually a twin of this case, CBS accused ABC of infringing on its copyright in the reality show *Survivor* by airing a program called *I'm A Celebrity ... Get Me Out Of Here.*  CBS alleged a "selection and arrangement" pattern claim, using the generic elements of "[v]oyeur verite, hostile environment in the desert island sense . . . building of social alliances, challenges arising from the game show element and serial elimination."  *Id.* at *21.  Like Mr. Rovin here, CBS's expert in *CBS I* also claimed that the "'genre . . . was only emerging'" and that the above elements were "'never found in that combination in any other show.'"  *Id.*; *see* Rovin Report at 6-7 (same claim with regard to arrangement of elements in *Big Brother*).

Judge Preska first noted that *I'm A Celebrity* "adds significant elements not found in *Survivor,* including . . . the audience participation element of the game show genre.  Thus the combination of elements . . . is not congruent."  *CBS I,* 2003 US. Dist LEXIS 20258, at *21-*22.  The same lack of congruence appears here.  Although CBS suggests that in both programs "contestants can be temporarily expelled from the house," the rule in *Big Brother* is permanent expulsion, and the temporary eviction of a houseguest has occurred four times in the program's 13-year history.  In *Glass House* an expelled contestant returns to the show each week and the escape from limbo represents a key aspect of the game.  CBS also claims that contestants vote each other off both shows, but in *Glass House* the <u>viewers</u> have the final say on expulsion, while in *Big Brother* the <u>contestants</u> have the final say.  Although both programs involve viewer input, as discussed above, in *Glass House* the viewers control all important outcomes, while *Big Brother* generally confines viewer participation to the fairly trivial, such as what sort of snack the contestants will eat.  CBS also cherry picks elements from various seasons of *Big Brother* in order to try to create a selection and arrangement of generic elements identical to *The Glass House*.  Thus CBS insists the abandoned viewer voting from

- 15 -

1    *Big Brother* season 1, the America's Player device from season 8, and the two-

2    person teams from season 13 are all of part of its selection and arrangement

3    argument, but those elements never coexisted on any one show, and cannot support

4    CBS's claim.  Moreover, lists of similarities are "inherently subjective and

5    unreliable." *Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984).  Courts

6    are particularly cautious where, as here, "the list emphasizes random similarities

7    scattered throughout the works." *Id.*

8         In addition, Judge Preska found that even if congruence between the selected

9    elements *had* existed, that would not have been enough to show infringement

10   because "the elements defining a genre, as [CBS's expert] testified *Survivor's*

11   elements do, without more are . . . too abstract to be protected." *CBS I*, 2003 U.S.

12   Dist. LEXIS 20258 at *22-23 (citing Judge Hand's "abstractions test" in *Nichols v.*

13   *Universal Pictures Corp.,* 45 F.2d 119, 121 (2d  Cir. 1930)).  As Professor Spigel

14   observes, *Big Brother* was one of four programs, including *Survivor,* premiering at

15   about the same time that defined a new kind of reality game show genre, each

16   combining very similar elements in similar ways.  *See* Spigel Report at 9-10

17   (describing advent of *Survivor, Big Brother, and I'm A Celebrity, Get Me Out Of*

18   *Here,* followed closely by *Temptation Island*).  Judge Preska held that where the

19   claimed selection and arrangement of generic elements essentially defines a whole

20   genre, "providing protection . . . without consideration of the presentation or

21   expression of those elements -- would stifle innovation and would stifle the creative

22   process that spawned the two shows at issue here." *CBS I,* 2003 U.S. Dist. LEXIS

23   20258, at *24-*25.

24        *TMTV, Corp. v Mass Productions, Inc.,* 645 F.3d 464 (1st Cir. 2011), on

25   which CBS primarily relies, is not to the contrary.  In *TMTV*, one of the creators of

26   a Spanish-language television sitcom left the television station where the sitcom

27   was produced and began work at a rival station.  He took many of the actors with

28   him and began production of a new sitcom.  The actors played the same characters

DEFENDANTS' OPPOSITION TO CBS'S
*EX PARTE* APPLICATION FOR TRO,
CV 12-04073

1  in the same setting in the new show, which the district court found to be virtually

2  identical in every way to the old show.  *Id.* at 467-68.  In affirming the district

3  court's grant of summary judgment in the copyright plaintiff's favor, the First

4  Circuit suggested the copying that occurred was so pervasive and seamless that the

5  following analogy applied: "Imagine, for example, that the first Sherlock Holmes

6  stories had been penned and copyrighted last year by Sir Arthur Conan Doyle, and

7  [the plaintiff-cross-defendant] had then written his own sequels carrying everything

8  forward into a new plot."  *Id.* at 471.

9        This is the type of specific, concrete "selection and arrangement" claim

10  originally contemplated in *Metcalf,* 294 F.3d at 1074, and its progeny.  *See Zella,*

11  529 F. Supp. 2d at 1138 ("Many courts have been reluctant to expand this concept

12  beyond the clear-cut case presented in *Metcalf*"; citing cases); *Harper House, Inc.*

13  *v. Thomas Nelson, Inc.*, 889 F.2d 197, 205 (9th Cir. 1989) ("[T]o the extent there is

14  creative expression left in how the works are put together, as a whole they can

15  receive only limited protection.  When the range of protectable and unauthorized

16  expression is narrow, the appropriate standard for illicit copying is virtual

17  identity.").  Nothing remotely like the identical patterns cited in *Metcalf* or *TMTV*

18  appears in this case.  Instead, the supposedly protectable "selection and

19  arrangement" of elements that CBS alleges exists at so high a level of abstraction

20  that it basically defines a reality show genre – more or less isolated contestants

21  living together and facing serial elimination through competitive challenges.  No

22  one can copyright a genre.  This Court should deny the application.

23  **B.    CBS's Trade Secret Claims Are Unlikely To Succeed On The Merits**

24

25        CBS sets forth 14 alleged trade secrets in Appendix A to its motion.  None of

26  these alleged trade secrets provide the basis for an injunction.

27

28

DEFENDANTS' OPPOSITION TO CBS'S
*EX PARTE* APPLICATION FOR TRO,
CV 12-04073

### 1. CBS Has Not Identified Any Secret Aspect Of The House Guest Manual Or Any Meaningful Use

CBS identifies a 371-page set of "*Big Brother* manuals" as a so-called trade secret. CBS Appendix; Edelman Decl. Ex. C.  CBS fails to identify any economically valuable secret within these voluminous manuals, and cannot leave to guesswork what within these manuals constitutes a "trade secret."  A trade secret claim that does not specifically identify any secrets fails as matter of law. *See, e.g.*, *Perlan Therapeutics, Inc. v. Superior Court*, 178 Cal. App. 4th 1333, 1350 (2009) (plaintiff not "entitled to hide its trade secrets in 'plain sight' by including surplusage and voluminous attachments in its trade secret statement.").[6]

One of the manuals is the "House Guest Manual."  The House Guest Manual includes everything from ███████████████████████████████ ██████████████████████████████████████. *See* Edelman Decl. Ex. C.  This is not a trade secret.  It is a collection of common sense instructions to the contestants living in the *Big Brother* house.  In fact, other Endemol *Big Brother* licensees outside the United States freely post such instructions on the internet.[7]

Moreover, even if the House Guest Manual were a trade secret (which it is not), *The Glass House's* instructions to its contestants look nothing like *Big Brother's* manual.  While a six year old House Guest Manual was typed up by an assistant, it was later returned to CBS and a different person, Debbie Anderson,

---

[6] To the extent CBS is relying on a "combination" of otherwise unprotectable material in the House Guest Manual, it must still "specifically describe what particular combination of components it has in mind, how these components are combined, and how they operate in a unique combination." *See, North American Lubricants Co. v. Terry*, No. CV-11-1284, 2011 WL 5828232, at *5 (E.D. Cal. Nov. 18, 2011) (quoting *Struthers Scientific & Int'l. Corp. v. General Foods Corp.*, 51 F.R.D. 149, 153 (D. Del.1970).

[7] *See, e.g.,* Luedtke Ex. A ("Pinoy *Big Brother* Rulebook") (Phillipines) ("A Psychologist will be available to all the housemates for counseling, either on request or more, if *Big Brother* feels it is necessary... There will also be support for housemates once they have left the house."); *Id.* ("In case of a serious fire hazard, housemates are instructed to go into the garden and *Big Brother* will advise further"); Ex. B  ("*Big Brother* Rules") (UK) ("Participants must wear their radio-microphones at all times during waking hours. Microphones can only be taken off in bed, in the shower and in the pool.").

1   created the first draft instructions for *The Glass House*.  Ms. Anderson did this

2   without reference to any *Big Brother* materials and she never worked on *Big*

3   *Brother*.  *See* Edelman Decl. Ex. A (Rosen Depo. at 109-110); Anderson Decl. ¶ 6.

4   In the days leading up to the arrival of the contestants this weekend, Keep Calm

5   finalized its instructions to contestants.  The final "Player Handbook" was

6   distributed to contestants late on Saturday night.  *See id.* ¶ 7, Ex. B.  *The Glass*

7   *House* Player Handbook looks nothing like the *Big Brother* House Guest Manual

8   except for a few stray items that are common sense or safety instructions.  It is not

9   surprising that they two books are different; the House Guest Manual was not used

10  in any way to create the Player Handbook.[8]

11          The second document relied upon by CBS is an old schedule for the master

12  control room at *Big Brother* from 2003 that Mr. Rosen referenced.  A nearly ten

13  year old control room schedule is not a trade secret.  Moreover, Mr. Rosen did not

14  use it.  He testified that the old schedule "actually didn't help me a whole lot"

15  because in the end he "basically took a look at the budget for [*The Glass House*]

16  that was premade and tried to divvy up the number that ABC gave me for story

17  department and spread it out over the number of positions I could fill based on

18  budget more so than on a schedule for the master control room."  Edelman Decl.

19  Ex. A (Rosen Depo. at 90-93) (explaining that he eventually hired less than half the

20  number of people indicated on the *Big Brother* schedule).

21

22

23

24  [8] CBS grossly exaggerates any similarities between the *Big Brother* manual, which
    is approximately 50 pages long, and the first draft of the manual for *The Glass*

25  *House*, which was four pages long.  *Compare* Edelman Decl. Ex. C with Ex. K.
    The *Big Brother* manual has approximately 50 sections.  Of those 50 sections in the

26  *Big Brother* manual, CBS stretches to allege overlap for five in Ms. Anderson's
    first draft.  *See* Mem. at 13.  Even if those sections were secret (and they

27  demonstrably are not), CBS's table of similarities on page 13 does not support a
    claim.  Of course CBS would not ask ABC not to give these safety instructions to

28  its contestants.

1   This six-year-old House Guest Manual and the nine-year-old master control

2   room schedule form the complete basis for CBS's specific allegations of

3   misappropriation.  CBS cites to nothing else.  This is not enough for an injunction.

4   **2.      CBS's Remaining Claimed Trade Secrets Are Frivolous**

5   The remaining alleged trade secrets (numbers two through fourteen) all relate

6   to the general production process for *Big Brother.*  For these, CBS does not allege

7   or point to any evidence that these allegedly trade secret processes have been, or

8   will be used, at *The Glass House.*  Instead, CBS seems to imply that to "pull off" a

9   production schedule similar to that of *Big Brother,* Defendants would necessarily

10  have to use *Big Brother's* supposedly secret techniques.  Mem. at 7.  This makes no

11  sense.  There is nothing unique or proprietary about CBS's fast production schedule

12  – for example, in 2003, *I'm a Celebrity... Get Me Out of Here* turned around

13  footage for broadcast *every day,* even faster than *Big Brother.*  Henson Decl. ¶ 8.

14  Moreover, CBS cannot ask the Court to *assume* former *Big Brother*

15  employees will use those processes.  Even if they were trade secrets (which they are

16  not), CBS bears the burden of proving misappropriation.  The mere fact that former

17  *Big Brother* employees know certain processes cannot support an injunction,

18  because California rejects the doctrine of inevitable disclosure.  *See Whyte v.*

19  *Schlage Lock Co.,* 101 Cal. App. 4th 1443, 1447, 1462 (2002) (noting "California

20  public policy strongly favors employee mobility").

21  That said, the identified production processes are *not* trade secrets.  Instead,

22  they are generally known jobs, equipment, and procedures well known throughout

23  the reality television production industry.  For example, CBS claims that ████

24  ███████████████████████████████████████████████████

25  ███████  Mem. at 8.  Yet, tune in to *Big Brother,* and the end credits display the

26  ███████████████████████  Rosen Decl. ¶¶ 41, 46.  CBS also claims

27  that it has a trade secret in ██████████████████████

28  ██████████████████████████  Mem. at 7-8.  But anyone watching the

show can see ████████████████████████████████████████

Rosen Decl. ¶ 36. ██████████████████████████████████████████

████████████████████████████████████████████████████████

████████   Defendants address the allegations related to alleged trade secrets two

through fourteen in the attached Appendix A.

### 3.   CBS Has Not Shown Reasonable Efforts To Maintain Secrecy

A trade secret must be the subject of "efforts that are reasonable under the

circumstances to maintain its secrecy."  Cal. Civ. Code 3426.1.  As set forth in

greater detail in the Appendix and declarations accompanying this Opposition, CBS

shared the alleged trade secrets with journalists, fans, and even executives of

competing networks, fatally undermining its trade secret claims.  *See, e.g.,*  Rosen

Decl. ¶ 25, 36, 40, 41; Henson Decl. ¶ 18; Bock Decl. ¶¶ 8-9; Wollman Decl. ¶ 18.

Furthermore, CBS states that it learned the production process for *Big

Brother* from its licensor, Endemol.  *See* Wollman Decl. ¶ 12.  CBS does not

provide any evidence that Endemol or its licensees are required to keep the alleged

trade secrets confidential, or that they take any measures at all to do so.  In fact, the

evidence is to the contrary, as exemplified by the Endemol licensees who freely

post their own versions of the "House Guest Manual" online.  *See* Luedtke Decl.

Exs. A & B.  Thus, CBS has failed to show that the alleged secrets are the subject

of reasonable efforts to maintain secrecy, and therefore, that they can be trade

secrets.  *See* Cal. Civ. Code. 3426.1(d).

### 4.   The Scope Of CBS's Injunctive Relief On The Trade Secret Claim Is Impermissibly Broad

This Court should not enjoin the entire *The Glass House* production based on

a production assistant typing up a six year old manual of instructions and a

reference to a master control room schedule from 2003, neither of which was

---

[4] *See* Rosen Decl. Ex. A (Reality Blurred website print-out).

DEFENDANTS' OPPOSITION TO CBS'S
*EX PARTE* APPLICATION FOR TRO,
CV 12-04073

1   ultimately used.  The mere fact that some former *Big Brother* employees were at

2   one point in possession of these *Big Brother* materials is not a basis to shut down

3   the show, even if those materials *were* confidential.  *See, e.g., Whyte,* 101 Cal. App.

4   4th at 1448 (affirming denial of injunction where, after being ordered to return

5   confidential materials, former employee "turned over a kitchen-sized garbage bag

6   of shredded documents and a Ziploc bag" containing multiple destroyed disks);

7   *FLIR Systems Inc. v. Parrish*, 174 Cal. App. 4th 1270, 1279 (2009) ("Mere

8   possession of trade secrets by a departing employee is not enough for an

9   injunction.").

10      At most, should the Court find that some confidential information was taken,

11   the remedy would be to prohibit the use of that specific information.  *See, e.g.*, *O*2

12   *Micro Int'l Ltd. v. Monolithic Power Systems, Inc.*, 399 F. Supp. 2d 1064, 1070

13   (N.D. Cal. 2005) (rejecting the "drastic measure of a production injunction"

14   because "normally the misappropriator is only barred from using the particular

15   secrets he or she has taken.").  Defendants have already returned all copies of the

16   documents discussed in CBS's motion, and are using an independently-created

17   contestant manual,  so there is no ongoing threat of use to be enjoined.

18      **C.     CBS Has Not Established That It Will Suffer Irreparable Harm**

19      CBS also has the burden of "demonstrat[ing] that irreparable injury is *likely*

20   in absence of an injunction."  *Winter*,  555 U.S. at 22 (emphasis in original).  CBS

21   has not met this burden because the only injury it alleges can be remedied with

22   monetary damages.  *See, e.g.*, *Sampson v. Murray,* 415 U.S. 61, 90 (1974)

23   (availability of compensatory relief "weighs heavily against a claim of irreparable

24   harm"). CBS argues that *Glass House* might "siphon away" viewers and weaken

25   *Big Brother* as a "lead-in" for other CBS shows.  Mem. at 24.  This type of loss can

26   be compensated with money damages.  *See, e.g.*, *Metromedia Broadcasting Corp.*

27   *v. MGM/UA Entertainment Co., Inc.*, 611 F. Supp. 415, 426 (C.D. Cal. 1985)

28   (plaintiff had not shown irreparable injury where alleged loss of viewers and injury

17686214.1                         - 22 -          DEFENDANTS' OPPOSITION TO CBS'S
                                                   *EX PARTE* APPLICATION FOR TRO,
                                                   CV 12-04073

1 to reputation was compensable in monetary damages).[9]  Indeed, if someone builds a

2 better mousetrap and the less effective mousetrap loses sales, this is the essence of

3 competition.

**D.     The Balance of Hardships Tips Sharply In Favor Of ABC**

5 A temporary restraining order is also inappropriate here because the balance

6 of hardships tips sharply in ABC's favor.  As set forth in the supporting

7 declarations of Kenny Rosen, Jeffrey Bader, Timothy Bock, Jill Gershman, and

8 Debbie Anderson, even a temporary delay in *The Glass House* premiere would be

9 devastating to ABC, Keep, the more than 140 persons working on *The Glass*

10 *House*, the vendors supplying the show, and the 14 contestants who just put their

11 life on hold and moved to Los Angeles.

12 There are a host of serious and significant harms that would stem from even a

13 one-week postponement of *The Glass House*.

- ***Harm To The Game.***  *The Glass House* game is intended to be played non-stop in real time.  The contestants have already moved into the house. Rosen Decl. ¶ 57.

- ***Loss of Promotional Campaign.***  If *The Glass House* is postponed by even a week, it would lose the benefit of the $16 million promotional campaign that featured the June 18 premiere date.  *See* Gershman Decl. ¶¶ 3-4.  If viewers tune in on June 18 and find a re-run of a different show,  they may never come back.  *See id.* ¶ 6.

- ***Harm To Summer Schedule.***  ABC scheduled *The Glass House* to maximize its chances of success.  *See* Bader Decl. ¶ 4, 6 (describing that process as occurring in January and February).  If the show is postponed, even by a week, it will dilute the strong lead-in benefits of following *The*

---

[9] CBS's cases are not to the contrary.  *See* Mem. at 24.  *Stuhlbarg Int'l Sales Co. v. John D. Krush & Co., Inc.*, 240 F.3d 832, 841 (9th Cir. 2001), involved an injunction that would allow customers to receive specific goods they ordered.  As one court noted, this "concrete" harm that would befall customers is very different than a speculative and general claim about the loss of future prospective customers. *See OG Int'l, Ltd. v. Ubisoft Entertainment*, No. 11-04980, 2011 WL 5079552, at *10 (N.D. Cal. Oct. 26, 2011) (holding that plaintiff alleging loss of customers and lack of ability to attract new customers had not demonstrated a significant threat of irreparable injury).  And in *Berster Tech., LLC v. Christmas*, No. S-11-1541, 2012 WL 33031 (E.D. Cal. Jan. 6, 2012), the court relied on the concrete fact that partners had shown reluctance to enter into new agreements with plaintiff because they were unsure who owned the rights to the technology at issue.  *Id.* at *10. There is no such concrete harm here.

DEFENDANTS' OPPOSITION TO CBS'S
*EX PARTE* APPLICATION FOR TRO,
CV 12-04073

*Bachelorette*, the promotional power of the NBA finals, and it will conflict with ABC's planned premieres for two new shows the week of June 25. *See id.* ¶¶ 7-9, 12.

An injunction that would cancel the show would have even more serious consequences.

- **Lost Development and Promotional Investment.** ABC has spent more than $27 million developing the show, which would be a total loss. *See* Bock Decl. ¶ 3; Gershman Decl. ¶ 3-4.

- **More Than 140 Lost Jobs.** More than 140 people would lose their jobs. Bock Decl. ¶¶ 4-6. This Court should "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24. Here, the public interest inquiry requires that this Court consider these individuals – 140 cameramen, editors, production assistants, etc. – who likely cannot find replacement employment this late in the season. *See* Bock Decl. ¶¶ 4-6; *see also* Anderson Decl. ¶ 4.

- **Lost Job Opportunities For Contestants.** The 14 contestants rearranged their lives, left jobs, turned down opportunities, and moved to Los Angeles this weekend to appear on *The Glass House*. If the show were significantly postponed or cancelled, they would have lost their opportunity for summer income. *See* Anderson Decl. ¶ 3.

Finally, this Court should consider the anticompetitive aspect of CBS's request for an injunction. On the copyright front, CBS brought this litigation against a competitive show to try to stop it from being aired, and thus to prevent American viewers from watching both shows to choose which show they prefer (or to choose both). Courts have found that the public interest disfavors injunctions, such as this, that would diminish competition. *See, e.g.*, *OG Int'l.*, 2011 WL 5079552, at *11. In addition, on the trade secret side, CBS has named its former employees in this lawsuit, threatening to shut down their new show because they elected to move to a different employer. An injunction that constrains job choice is contrary to "settled legislative policy in favor of open competition and employee mobility." *Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 946 (2008).

Similarly, "[t]here is a strong presumption against any injunction that could act as a 'prior restraint' on free speech." *Religious Tech. Center v. Netcom On-Line Commc'n Servs., Inc.*, 907 F. Supp. 1361, 1383 (N.D. Cal. 1995) (citation omitted);

1  *see also Goldblum v. Nat'l Broadcasting Corp.*, 584 F.2d 904, 906-07 (9th Cir.

2  1978) (prior restraints presumptively unconstitutional).  "A procedure thus aimed

3  toward prepublication censorship is an inherent threat to expression, one that chills

4  speech."  *Goldblum*, 584 F.2d at 907.  To grant CBS's request and restrain *The*

5  *Glass House* from even being recorded, let alone aired, raises "a valid First

6  Amendment question" about the scope of injunctive relief requested.  *Religious*

7  *Tech. Center*, 907 F. Supp. at 1383.[10]

8         **E.**    **There Is No Basis For An Injunction Based On Alleged Spoliation.**

9       CBS also seeks an injunction for Defendants to "cease further destroying

10  documents that are relevant to the parties' claims or defenses or likely to lead to the

11  discovery of admissible evidence."  First, it is simply untrue that Mr. Rosen

12  destroyed documents "pertaining to this suit" as CBS alleged.  Mem. at 1.

13  Mr. Rosen did delete some emails tangentially related to *Glass House* after the

14  litigation began, but those were emails he received and were non-substantive.  *See*

15  Rosen Decl. ¶ 53.  Moreover, immediately after the litigation began, a forensic

16  firm, FTI, was retained and it forensically imaged all of Mr. Rosen's emails (as well

17  as his laptop and cell phone) on May 14, 2012 and again on June 5, 2012.  *See*

18  Declaration of Benjamin Hodges ¶¶ 5-8.  Mr. Rosen understands his preservation

19  obligations going forward.  *See* Rosen Decl. ¶ 56.  Thus, there is no ongoing

20  destruction of evidence and no need for an injunction to preserve evidence.

21  **IV.**    **CONCLUSION**

22       Defendants respectfully request that this Court deny CBS's *ex parte*

23  application for a temporary restraining order.

24

25  [10] CBS's suggested $25,000 bond is inappropriate under Federal Rule of Civil Procedure 65(c).  The harm of a wrongful injunction in this case would be

26  extraordinary.  As detailed above, a temporary restraining order, even if just for one week, will devastate Defendants efforts to launch this new show after substantial

27  promotional efforts have been made.  Thus, the proper security required under Rule 65(c) is at least $27 million.  *See Nintendo of America, Inc. v. Lewis Galoob*

28  *Toys, Inc.*, 16 F.3d 1032, 1034 (9th Cir. 1994) ($15 million security).

DEFENDANTS' OPPOSITION TO CBS'S *EX PARTE* APPLICATION FOR TRO, CV 12-04073

1   DATED: June 11, 2012           Munger, Tolles & Olson LLP

2                           GLENN D. POMERANTZ
                             JONATHAN E. ALTMAN

3                           CAROLYN HOECKER LUEDTKE
                           PETER E. GRATZINGER

4

5

6                      By: */s/  Carolyn Hoecker Luedtke*

7

8                      Attorneys for Defendants

9                      American Broadcasting Companies, Inc.,
                      The Walt Disney Company, Disney

10                    Enterprises, Inc., ABC, Inc., dba
                      Disney/ABC Television Group and Keep

11                    Clam and Carry On Productions, Inc.

12   DATED: June 11, 2012           Early Sullivan Wright, Et Al.

13                        DEVIN A. MCRAE

14                        CHRISTOPHER I. RITTER

15

16                      By: */s/ Devin A. McRae*

17

18                      Attorneys For Defendants

19                      Kenny Rosen, Corie Henson, and
                      Michael O'Sullivan

20

21

22

23

24

25

26

27

28

17686214.1                  - 26 -             DEFENDANTS' OPPOSITION TO CBS'S
                                            *EX PARTE* APPLICATION FOR TRO,
                                            CV 12-04073