SCOTT A. EDELMAN, SBN 116927
SEdelman@gibsondunn.com
MICHAEL W. SEITZ, SBN 271136
MSeitz@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2029 Century Park East
Los Angeles, CA  90067-3026
Telephone:  310.552.8500
Facsimile:   310.551.8741

THEANE EVANGELIS KAPUR, SBN 243570
TKapur@gibsondunn.com
BLAINE H. EVANSON, SBN 254338
BEvanson@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone:  213.229.7000
Facsimile:   213.229.7520

Attorneys for Plaintiff,
CBS BROADCASTING INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| CBS Broadcasting Inc., | CASE NO. 2:12-cv-04073 GAF (JEMx) |
| Plaintiff, | **CBS'S REPLY IN SUPPORT OF ITS *EX PARTE* APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND AN ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 65** |
| v. | |
| American Broadcasting Companies Inc., et al., | |
| Defendants. | **Hearing:** |
| | Date:      None set |
| | Time:      None set |
| | Place:      Courtroom No. 740 |
| | Judge:      Hon. Gary A. Feess |

# TABLE OF CONTENTS

Page

I.      Introduction ............................................................................... 1

II.     CBS Is Likely To Succeed On Its Copyright Infringement Claim ..................... 2

        A.      Defendants' Opposition Confirms That *Glass House* Is By Now In
                A Concrete, Final Form.................................................................. 3

        B.      Defendants Concede Access Which Lowers CBS's Burden to Show
                Substantial Similarity ................................................................... 3

        C.      Defendants Failed To Identify A <u>Single</u> Show, Other Than *Glass
                House*, That Shares *Big Brother*'s Compilation Of Elements ................... 4

        D.      Defendants Identify No <u>Significant</u> Differences That Result In
                *Glass House* Having Different Expression Than *Big Brother*.................. 6

III.    CBS Is Likely To Succeed In Establishing Trade Secret Misappropriation........ 8

        A.      Defendants' Arguments That CBS'S Trade Secrets Are Not
                Protectable Are Unavailing Because They Concede
                Misappropriation .......................................................................... 9

        B.      CBS Has Established Reasonable Efforts To Maintain Secrecy ............. 13

        C.      A Production Injunction Is Necessary To Avoid Additional
                Misappropriation ........................................................................ 14

IV.     Defendants Offer No Reasons Not To Enjoin Their Admitted Destruction
        of Evidence ............................................................................... 15

V.      The Balance Of Equities Favor CBS, As CBS Will Be Irreparably
        Harmed Without Injunctive Relief ................................................... 15

VI.     Conclusion ................................................................................ 17

Gibson, Dunn &
Crutcher LLP

i

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Blankenship v. Hearst Corp.*,
  519 F.2d 418 (9th Cir. 1975) .................................................................. 15

*CBS Broad., Inc. v. ABC, Inc.*,
  No. 02 Civ. 8813, 2003 U.S. Dist. LEXIS 20258 (S.D.N.Y. Jan. 14, 2003) ........... 6

*Coquico, Inc. v. Rodriguez-Miranda*,
  562 F.3d 62 (1st Cir. 2009) ...................................................................... 5

*Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*,
  924 F.Supp. 1559 (S.D. Cal. 1996) ........................................................ 16

*DVD Copy Control Ass'n, Inc. v. Bunner*,
  31 Cal.4th 864 ..................................................................................... 17

*Feist Pub'lns, Inc. v. Rural Tel. Serv. Co.*,
  499 U.S. 340, 362 (1991) ......................................................................... 7

*Granny Goose Foods, Inc. v. B'hood of Teamsters & Auto Truck Drivers Local No. 70*,
  415 U.S. 423 (1974) ............................................................................... 15

*Metcalf v. Bochco*,
  294 F.3d 1069 (9th Cir. 2002) ............................................................. 4, 5

*Morlife, Inc. v. Perry*,
  56 Cal.App.4th 1514 (1997) .............................................................. 11, 13

*Nichols v. Univ. Pictures Corp.*,
  45 F.2d 119 (2d Cir. 1930) ....................................................................... 4

*O2 Micro Int'l v. Monolithic Power Sys.*,
  420 F. Supp. 2d 1070 (N.D. Cal. 2006) .......................................... 9, 11, 15

*ReadyLink Healthcare v. Cotton*,
  126 Cal.App.4th 1006 (2005) ................................................................ 13

*Rice v. Fox Broad. Co.*,
  300 F.3d 1170 (9th Cir. 2002) ................................................................. 3

*Richmond Techs., Inc. v. Aumtech Business Sol'ns*,
  No. 11-cv-02460-LHK, 2011 WL 2607158 (N.D. Cal. July 1, 2011) ............. 2, 16

*Straughter v. Raymond*,
  2011 WL 3651350 (C.D. Cal. 2011) .......................................................... 7

*Swirsky v. Carey*,
  376 F.3d 841 (9th Cir. 2004) ............................................................... 3, 4

*TMTV Corp. v. Mass Prods., Inc.*,

# TABLE OF AUTHORITIES
(continued)

Page(s)

645 F.3d 464 (1st Cir. 2011)..................................................................4, 5

*Vt. Microsystems, Inc. v. Autodesk, Inc.*,
88 F.3d 142 (2d Cir. 1996) ...................................................................... 9

*Wetzel's Pretzels, LLC v. Johnson*,
797 F.Supp.2d 1020 (C.D.Cal. 2011) ..................................................... 16

*Wyndham Resort Dev. Corp. v. Bingham*,
2010 WL 2740158 (E.D.Cal. 2010) .......................................................... 9

# I.    Introduction

Defendants' late-filed opposition to CBS's *ex parte* TRO application is short on the merits and replete with procedural improprieties.[1]  Because of the voluminous nature of Defendants' submission and in the interest of time, CBS submits this brief reply that focuses only on the substance of Defendants' arguments.  CBS intends to provide responses to Defendants' evidentiary objections, as well as objections to the declarations proffered by Defendants, and hopes that the Court will allow it to do so in the course of any subsequent briefing or hearing on a preliminary injunction.

CBS has established its entitlement to a TRO based on both copyright infringement and misappropriation of trade secrets.  Regarding copyright infringement, Defendants concede a high degree of access—which in turn lowers CBS's burden to demonstrate substantial similarity, *see, e.g.*, *Rice v. Fox Broad. Co.*, 300 F.3d 1170, 1178 (9th Cir. 2002)—and they fail to identify a single show (other than their own) that employs the same compilation of elements and expression that *Big Brother* does.  Instead, what Defendants have done thus far is continually change their story on infringement.  They used to say that their show was not final; now they do not.  Their Show Runner (Kenny Rosen) tried to say *Glass House* was based on the teenage fiction series *The Hunger Games* rather than *Big Brother* (Declaration of Scott A. Edelman in Support of *Ex Parte* Application for a TRO and OCS re a Preliminary Injunction ("Edelman Decl."), Exh. A ("Rosen Dep.") at 27:16-21, 39:20-24); Defendants now abandon that position.  And now all Defendants offer is a series of

---

[1]  To name a few:  (1) Defendants included a 10-page, single-spaced "appendix," which consists of legal and factual arguments that nearly double the 25-page length restriction imposed by Local Rule 11-6, and which therefore should be struck from the record; (2) Defendants failed to serve CBS with their appendix until after 8:30 p.m. on Monday night; (3) all of Defendants' papers were filed after 5:00 p.m., the deadline by which the Court ordered Defendants to file any opposition; and (4) Defendants submitted a percipient witness declaration with a legally ineffectual digital signature (*see* Bock Decl.; Local Rule 5-4.3.4(a)(3) (for non-attorney declarations "the filer shall scan the hand-signed signature page(s) of the document in PDF format").

Gibson, Dunn &
Crutcher LLP

trivial distinctions such as differences between the show's rules, without articulating how any of these differences translate into *meaningful differences between the expressive qualities of Glass House and Big Brother*.  But as Defendants never dispute, both shows will feature the same expressive quality that is uniquely *Big Brother*'s and which it pioneered; *Big Brother* takes a format where contestants are sequestered in a house, filmed around the clock by 50 cameras, and placed in competitive situations where alliances will form and tensions will rise, and the show depicts that form of competition with heightened reality and voyeurism because the episodes are broadcast shortly after the events occur and with minimal alteration or editing.  Meanwhile, on trade secrets, having been caught in culpable conduct in the one deposition taken to date, Defendants concede misappropriation entirely, only to try to minimize the value of the material stolen.

The clear theft and use of CBS's material, coupled with the admitted destruction of emails, clearly warrants a TRO at this stage.  And ABC's protestations that injunctive relief would harm their business are of no moment because any harm is of their own making and should not bar relief designed simply to protect the status quo and ensure that ABC be allowed only "to compete, *in a lawful manner*, with Plaintiff."  *Richmond Techs., Inc. v. Aumtech Business Sol'ns*, No. 11-cv-02460-LHK, 2011 WL 2607158, at *22 (N.D. Cal. July 1, 2011) (emphasis added).

## II.   CBS Is Likely To Succeed On Its Copyright Infringement Claim

Instead of disputing whether they are copying, Defendants simply try to rationalize it, claiming that "[w]hen a successful reality show develops a good idea, other shows observe that idea and incorporate it into their own show."  (Opp'n at 14.)  But CBS is not complaining about the copying of an idea.  What Defendants did here was entirely different:  They had an extraordinary level of access to *Big Brother*, used it to produce *Glass House*, then lifted not just a few of *Big Brother*'s elements, but the entire protectable *expression and compilation* of them.  And now, only after the fact, do Defendants try to latch onto trivial rule changes, which are insignificant distinctions

and do not translate into tangible differences that distinguish *Glass House*'s overall expression from *Big Brother*'s.

## A.   Defendants' Opposition Confirms That *Glass House* Is By Now In A Concrete, Final Form

Notably, Defendants' Opposition—for the first time in this case—resists arguing against copyright infringement on the ground that *Glass House* does not yet exist and therefore cannot be substantially similar to *Big Brother*.  CBS understands this to mean that Defendants are finally conceding that the format of *Glass House* is now fixed in advance of the series' June 18, 2012 premiere and the live internet streaming beginning today.  Given Defendants' voluntary concession on this point, it is appropriate to compare the similarities between *Glass House* and *Big Brother* as they exist now.

## B.   Defendants Concede Access Which Lowers CBS's Burden to Show Substantial Similarity

By conceding access, Defendants attempt to downplay the significant of their hiring of nearly thirty *Big Brother* production employees (Opp'n at 5 & n.3), claiming that "[b]ecause no dispute regarding access exists here, CBS's claim hinges on its ability to demonstrate substantial similarity."  That grossly distorts the importance of access here.

A "concession of access by the defendant" is a "prominent factor" in finding copyright infringement, because "[u]nder the inverse ratio rule, [there is] a lower standard of proof of substantial similarity when a high degree of access is shown."  *Rice*, 300 F.3d at 1178.  Moreover, where a defendant "concede[s] that [they] had a *high degree of access* to [a plaintiff's work]," the plaintiff's "burden of proof of substantial similarity is *thus commensurately lowered*."  *Swirsky v. Carey*, 376 F.3d 841, 844 (9th Cir. 2004) (emphases added).

Ignoring all of this, Defendants (in a footnote, Opp'n at 5 n.3) say that "CBS's 'poaching' charge is nonsense," and "[e]veryone in America has all the access they

could possibly have to *Big Brother*'s expressive elements [for the past 13 seasons]." But copyright law does not ignore reality in the way that Defendants try to; it is highly probative of copying and substantial similarity because here, it is not as if Defendants hired 30 random employees from one reality show to work on a run-of-the-mill reality show; they targeted 30 *key* people from the *only* successful fast-turnaround "house reality" competition show to comprise the key production staff of a copycat show. Copyright law recognizes that circumstances like these are highly probative.  *See, e.g.*, *TMTV Corp. v. Mass Prods., Inc.*, 645 F.3d 464, 470 (1st Cir. 2011) (copying was "not in doubt" where ex-employee "obviously had access to the original scripts and based [the new show] upon them" and brought a number of actors from the original show); *Swirsky*, 376 F.3d at, 844 & n.3 (9th Cir. 2004) ("high degree of access" leading to a "lower standard of proof of substantial similarity" where "[a] number of people involved in recording [plaintiff's] work were also involved in the recording of [defendant's] work").  Saying there is "no dispute regarding access . . . here" (Opp'n at 5 n.3) is an understatement.

## C.   Defendants Failed To Identify A <u>Single</u> Show, Other Than *Glass House*, That Shares *Big Brother*'s Compilation Of Elements

Because a plaintiff's copyright case is "strengthened considerably" by "defendant's concession of access to their work," *Metcalf v. Bochco*, 294 F.3d 1069, 1075 (9th Cir. 2002), it simply does not do for Defendants to caricature *Big Brother* as "people living in a house, competing with each other to avoid elimination, and winning a prize."  (Opp'n at 1.)  That is as useful as saying that *Sherlock Holmes* lacks copyrightable expression because it is just "the idea of a detective and a sidekick, who live in London, and use disguises and forensic science to solve crimes."  As Judge Learned Hand observed, "a great number of patterns of increasing generality will fit equally well as more and more of the incident is left out."  *Nichols v. Univ. Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930).  Defendants' level of generality conveniently glosses over all the similarities between the shows.  Likewise, Defendants' attempt to

dissect each element of the show (*see, e.g.*, Opp. at 11) loses sight of the *complete expression* of *Big Brother*, which is copied directly by *Glass House*. *See also Coquico, Inc. v. Rodriguez-Miranda*, 562 F.3d 62, 67 (1st Cir. 2009) ("In [evaluating copyright infringement], the court should not lose sight of the forest for the trees; that is, it should take pains not to focus too intently on particular unprotected elements at the expense of a work's overall protected expression.").

But the point Defendants (and for that matter, their expert) never address is that no other show until now has incorporated all the elements together that *Big Brother* has. As CBS's expert Jeffrey Rovin explains in his rebuttal report, the essence of CBS's copyright claim is that it is the *combination* of various devices all wrapped up in one show—not just contestants in a house, not just periodic evictions, not just fast turnaround broadcast, for example, but all these elements combined—that "makes *Big Brother* unique in the reality television world" and "had never appeared in the history of reality show television." (Decl. of Michael W. Seitz, Ex. A ("Rovin Rebuttal") at 1.) Even Kenny Rosen acknowledged that no other show—besides *Glass House*— combines the elements found in *Big Brother* (Rosen Dep. at 171), and indeed, no other show that Defendants cite even manages to share greater than four common elements with *Big Brother* (Rovin Rebuttal at 5). Despite Defendants' attempts to portray it otherwise, it is clearly established that combining all these elements, whether individually protectable or not, in an infringing work is the basis of a compilation claim. *See, e.g.*, *Metcalf*, 294 F.3d at 1073-74 (even where individual elements were not protectable, the "presence of so many generic similarities" and the "common patterns in which they [arose]" led to "striking" similarities between the two works); *Shaw*, 919 F.2d at 1363 (similar); *TMTV*, 645 F.3d at 470 n.4 ("Such an ensemble may be protected by copyright when reduced to expression . . . even though it may itself contain non-copyrightable elements such as stock characters borrowed from prior works."). And it is this compilation aspect that distinguishes this case from others like *Milano v. NBC Universal, Inc.*, 584 F. Supp. 2d 1288 (C.D. Cal. 2008), where the

1  court was asked to address only a preliminary treatment of a show, where plaintiff's

2  copyright claim centered on discrete elements and ideas, rather than a unified

3  compilation and expression as a whole.

4  Defendants' only rebuttal to CBS's compilation argument is a misleading

5  analogy to the *Survivor/I'm A Celebrity . . . Get Me Out of Here* case.  But there, the

6  *expressive* quality of the two shows, among other facts, set them apart:  as the court

7  observed, the "major difference between the two shows is the serious tone of Survivor

8  and the comedic tone of Celebrity," not to mention *Survivor*'s "camera work . . . of the

9  very highest professional level" contrasted "to the home video look" of *I'm a*

10  *Celebrity.  CBS Broad., Inc. v. ABC, Inc.*, No. 02 Civ. 8813, 2003 U.S. Dist. LEXIS

11  20258, at *28-29 (S.D.N.Y. Jan. 14, 2003).  Moreover, the *Survivor* case undoubtedly

12  lacked the additional clear-cut evidence of infringement here—namely, the mass

13  poaching of critical employees, along with admissions from Show Runners like Rosen

14  that the newer show shares all the key elements of the original.

15  **D.    Defendants Identify No <u>Significant</u> Differences That Result In *Glass House***

16  **Having Different Expression Than *Big Brother***

17  "'No plagiarist can excuse the wrong [of infringement] by showing how much

18  of his work he did not pirate.'"  *Shaw*, 919 F.2d at 1362 (quoting 4 Nimmer on

19  Copyright § 1303[B][1]).  And the only differences Defendants offer between *Glass*

20  *House* and *Big Brother* are simply immaterial.  *See TMTV*, 645 F.3d at 471 ("[T]rivial

21  modifications are not a defense [to copyright infringement].").

22  For example, Defendants insist that the viewers of *Glass House* "███████

23  ████████████████████████" (Opp'n at 10), glossing over the facts that ██

24  ████████████████████████████████████████████ (the same

25  current format as *Big Brother*) and that *Big Brother* also has had the public vote

26  contestants off the show.  And Defendants' attempt to distinguish "limbo" is simply

27  disingenuous:  that "██████████████████████████████████████

28  █████████████████████████████████" (*id.* at 15) is just a disguised

Gibson, Dunn &
Crutcher LLP

way of saying that, as in *Big Brother*, one of the bottom two-ranking contestants is

voted off while the other gets to stay.  Meanwhile, Defendants point to *Big Brother*'s

host Julie Chen as a supposed difference, which actually proves CBS's point.  (Opp'n

at 10.)  Chen rarely appears on the show (usually as an add-on at the beginning or end),

and while she may give instructions during the show, *Glass House* uses a very similar

method, a ███████████████████████████████████████████████  This is simply

more evidence that *Glass House* emulates *the* key expressive features of *Big Brother*—

namely, an unscripted house reality competition show whose voyeuristic feel depends

on minimal interaction between cast and production, and viewer and production.

(Rosen. Decl. ¶¶ 193, 194, 196; *see also* Rovin Rebuttal at 8-9 (explaining how

Defendants' proffered distinctions between the shows are insignificant).)

Tellingly, Defendants make no real attempt to explain just exactly how any of

their trivial distinctions actually translate into differences in the look and feel of *Glass

House* compared to *Big Brother*.  The closest Defendants get is asserting (through

attorney argument, not competent evidence) that "the two programs encourage

different character traits."  (Opp'n at 10.)  But even if this came close to articulating

some meaningful difference (which it does not), "[a]s Professor Nimmer explains, 'it is

entirely immaterial that, in many respects, plaintiff's and defendant's works are

dissimilar, if in other respects, similarity as to a substantial element of plaintiff's work

can be shown.'"  *Straughter v. Raymond*, 2011 WL 3651350, at *16 (C.D. Cal. 2011)

(quoting 4 Nimmer on Copyright § 1303[B][1]).

Because copyright protects "the *expression* of . . . ideas" over and above the

"ideas themselves," *Feist Pub'lns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 362

(1991), the ultimate question is how are *Glass House*'s expressive qualities different

from *Big Brother*'s, despite all of the other similarities the two share?  Defendants and

their expert never say, and they simply do not address the heart of *Big Brother*'s

unique expression:  a voyeuristic house reality show that is edited to broadcast in

virtually real time (rather than being edited down after the entire season airs to fit a

1   known outcome).  *See* Rovin Rebuttal at 4 ("*Big Brother* did not simply lift ideas

2   whole, as the Defendants imply.  The creators shaped and reimagined them, pared

3   them and expanded them, refined and redefined them to create a new kind of reality

4   show.  It was not a random recipe.  It was an ingenious creative effort that resulted in a

5   new balance, a unique expression.").  If Defendants have their way, a show that copies

6   *Big Brother*'s protectable expression in every material way will soon air.  It should not.

7   **III.   CBS Is Likely To Succeed In Establishing Trade Secret Misappropriation**

8          Defendants' arguments regarding CBS's trade secret claim focus almost

9   exclusively on whether CBS has identified protectable trade secrets.  (Opp'n at 17-21;

10  Defs' App'x A.)  This should come as no surprise because Mr. Rosen has already

11  conceded multiple acts of use and disclosure of *Big Brother* materials while working

12  on *Glass House*.  (*E.g.*, Rosen Dep. at 90:15-19, 94, 98)  But Defendants' attack on

13  CBS's trade secrets suffer from a fatal defect:  If *Big Brother*'s materials are publicly

14  available, and/or valueless "common sense" (Opp'n at 19), then why was it necessary

15  for Mr. Rosen—who testifies of having "worked in television production for over 15

16  years" and of "working my way up the ranks from Story Editor to Co-Executive

17  Producer" on *Big Brother* (Rosen Decl. ¶ 2)—to consult them, disclose them to his

18  colleagues, and have them "typed up?"  The answer is obvious:  Mr. Rosen did so

19  because he believed the materials were valuable and he needed them to produce *Glass*

20  *House*.

21         Moreover, Defendants' recitation of all the reasons they believe CBS's trade

22  secret designations are inadequate under California Civil Code section 2019.210 (*e.g.*

23  Opp'n at 18), including their voluminous "Appendix A" arguing against each

24  designation separately—which should be stricken too[2]—is a sideshow and an effort to

25

26  [2]  Defendants' Appendix A consists of ten additional pages of argument and legal
     authorities, exceeding the Court's 25-page limit, and should be stricken.  *See* L.R.
27  11-6.  Alternatively, if the Court is not willing to strike Defendants' Appendix A,
     CBS respectfully requests that the Court consider CBS's response, which is
28  attached as Appendix A to this brief.

distract the Court from the obvious misappropriation that has already taken place. Section 2019.210 is a discovery provision, and the subject of separate briefing before Magistrate Judge McDermott; it is not central to a request for a TRO, which CBS has brought based on the minimal discovery it has been able to conduct to date and based on the information publicly disclosed by Defendants about *Glass House*.  CBS has identified, and Defendants know exactly, which trade secrets are at issue here.  For the TRO, CBS need only establish that it is *likely to succeed* in showing that its trade secrets are protectable and that Defendants have misappropriated them, not the reasonable particularity necessary to commence trade secret related discovery.  *See, e.g.*, *Wyndham Resort Dev. Corp. v. Bingham*, 2010 WL 2740158 (E.D.Cal. 2010). CBS has done so here, and Mr. Rosen's conduct and admissions provide ample evidence to warrant injunctive relief.

## A. Defendants' Arguments That CBS'S Trade Secrets Are Not Protectable Are Unavailing Because They Concede Misappropriation

First, Defendants concede that Mr. Rosen used the *Big Brother* HouseGuest Manual for his work on *Glass House*, asserting only that Mr. Rosen's use was not "meaningful" while minimizing as just "common sense."  Of course, Defendants' counsel improperly instructed Rosen in his deposition not to answer questions as to why Rosen had the manual typed up.  But if the HouseGuest manual is just common sense material with no trade secret value, then it would have been unnecessary for Mr. Rosen to "type it up."  (Rosen Dep. at 94:17-19.)  Mr. Rosen's "typing up" of the HouseGuest Manual is direct evidence that it was useful in the hands of a *Big Brother* competitor—*per se* evidence of its value to *Big Brother*.  And regardless, it is well settled that compilations of material like the *Big Brother* HouseGuest Manual, even if they are comprised of non-secret material, are protectable as trade secrets.  *Vt. Microsystems, Inc. v. Autodesk, Inc.*, 88 F.3d 142, 147 (2d Cir. 1996); *O2 Micro Int'l v. Monolithic Power Sys.*, 420 F. Supp. 2d 1070, 1089 (N.D. Cal. 2006).  It is absurd for Defendants to suggest that the 50-page HouseGuest Manual—which indisputably

"represent[s] many years of trial-and-error and reflect[s] the wide range of considerations that production must take into account when interacting with HouseGuests" (Edelman Decl., Exh. D ("Wollman Decl"). ¶ 15)—is mere "common sense" with no value to *Big Brother*.[3]

Moreover, the fact Defendants now have a "final 'Player Handbook'" (which Defendants produced to CBS for the first time with their opposition papers) that allegedly "looks nothing like the *Big Brother* House Guest Manual except for a few stray items" does not excuse their misappropriation.  If anything, it is evidence, and further discovery will reveal, that Defendants have now cleansed their manual of the material they "typed up" and plagiarized from *Big Brother*.  Removing the offending content does not change the fact that Mr. Rosen disclosed the manual to his colleagues and made used of it on *Glass House*.[4]

Second, although Mr. Rosen testified that he "referenced [the *Big Brother* MCR schedule] to figure out how many story positions . . . to hire," Defendants argue that this does not constitute "use" of the MCR schedule because it "actually didn't help [him] a whole lot."  (Opp'n at 19.)  *How much* the MCR Schedule "helped" Mr. Rosen is beside the point; the standard for trade secret misappropriation is "use"—and

---

[3]  Defendants' reliance on *Perlan Therapeutics, Inc. v. Superior Court*, 178 Cal.App.4th 1333 (2009) to suggest that the manual is not a trade secret is misplaced.  *Perlan* addressed whether trade secret disclosures were reasonably particular under California Civil Code section 2019.210, not whether (having already been misappropriated) specific documents could qualify as protected compilations.  Moreover, *Perlan* involved, among other things, "a full page of text consisting of a 'preliminary Statement' and 'general objections' … similar … to the boilerplate reservations of right and objections," references to "approximately 50 additional documents," and designations of "*all* related research, development, advancements, improvements and processes related" to three specified trade secrets.  *Id*. at 1339, 1341 (emphasis added).  Those circumstances do not apply here.

[4]  Defendants call CBS's chart showing the similarities between the "first draft" of the *Glass House* manual and the *Big Brother* HouseGuest Manual a "gross[] exaggerat[ion]."  A cursory review of the chart CBS provided makes it clear that the language is plagiarized, and Defendants' attempt to shrug off the similarities is troubling given their repeated assurances that they will "remediate" any ongoing misappropriation.  (*E.g.* Dkt. 44 at 18.)

Gibson, Dunn & Crutcher LLP

Defendants cannot seriously dispute that the MCR schedule was in fact used here.  *E.g.*  *O2 Micro*, 399 F. Supp. 2d at 1070, 1073, 1075 ("internal experimentation with trade secret information," "use for research and development," and use for evaluative purposes all constitute illegal misappropriation).  Further, Mr. Rosen did not just admit to his own use—he also conceded that he "showed the master control room schedule to Marie Mitchell [a *Glass House* employee not yet deposed] . . . . [p]robably in March." (Rosen Dep. at 94:11-14.) This admitted *disclosure* of the MCR Schedule is a separate and independent act of misappropriation, regardless of whether the material was "a whole lot" helpful.  *Morlife, Inc. v. Perry*, 56 Cal.App.4th 1514, 1527 (1997) ("Under the UTSA, simple disclosure . . . may suffice to create liability.")  In addition, Defendants do not argue (nor could they given the evidence in this case and Mr. Rosen's obligations under his nondisclosure agreement with *Big Brother*) that *Big Brother* failed to take reasonable steps to maintain the confidentiality of the MCR Schedule; and the fact that Mr. Rosen found it necessary to consult and disclose the MCR Schedule during his work for a competitor is evidence of the schedule's value.

Third, Defendants gloss over the ongoing threat of misappropriation—a wholly separate basis for this TRO application—by responding only to these openly conceded acts of misappropriation (uses of the HouseGuest Manual and the MCR Schedule, and disclosure of both).  But these acts were discovered after only one deposition and with more than begrudging access to a very limited universe of *Glass House* documents. This evidence alone justifies the issuance of a TRO because it is establishes that a TRO is necessary to:  (1) "insure against additional harm from further unauthorized use of the trade secret and to deprive the defendant of additional benefits from the appropriation," and (2) "remedy any head start or other unfair advantage [already] acquired." *DVD Copy Control Ass'n v. Bunner*, 116 Cal. App. 4th 241, 253-54 (2004).

Indeed, these instances are only the tip of the iceberg in what was a calculated scheme to poach former *Big Brother* employees in order to gain access to the trade secrets and creative processes they gained knowledge of on *Big Brother*.  CBS is likely

to succeed in showing further misappropriation by Defendants once it is allowed further discovery.

For example, Defendants do not contend (nor could they) that is customary for an up-start show to have its production staffed by individuals who previously worked on a rival network's similar, highly successful competing show that airs during the same time of year.[5]  The evidence (and common sense) establishes otherwise. (Wollman Decl. ¶ 8 ("Typically, when show staffers work on other shows, it is because the other shows do not air during the same season . . . But in my 44 years in the entertainment industry, I have never seen anything like this—where a competitor hires a large number of people for a startup competing show, which airs during the same time of year.").  Moreover, even at this stage, there is evidence that these individuals were hired specifically for the knowledge they gained on *Big Brother*. Defendants initiated the contact with the former *Big Brother* employees.  (See, e.g., Wollman Decl. ¶ 6.)  ████████████████████████████████████

████████████████████████████████████████████████████

████████████  Indeed, Mr. Rosen even testified that when he recruited former *Big Brother* employee Carle Simpson to work on *Glass House*, he sent her an email (not yet produced) stressing the "big MCR similar to *Big Brother*."  (Rosen Dep. at 64:10-66:21.)  This is not, as Defendants suggest, a case where CBS asks the Court to "assume former *Big Brother* employees will use those processes."  (Opp'n at 20.)  This is a clear cut case where Defendants admitted to using, and where all the evidence suggests Defendants *intend to continue using*, CBS's trade secrets in producing their

---

[5] Neither *FLIR Systems, Inc. v. Parrish*, 174 Cal.App.4th 1270 (2009) nor *Whyte v. Schlage Lock Co.*, 101 Cal.App.4th 1443 (2002) help Defendants here, where there is admitted misappropriation.  *See FLIR Systems*, 174 Cal.App.4th at 1275 (after "eight days of testimony, the trial court found no misappropriation or threatened misappropriation");  *Whyte*, 101 Cal.App.4th at 1458 (we "have serious concerns over evidence in the record suggesting Whyte took Schlage's trade secrets or destroyed evidence [but] [w]e are constrained …by the applicable standard of review….").

show—acts which the Court unquestionably can enjoin.  *See, e.g.*, *ReadyLink Healthcare v. Cotton*, 126 Cal.App.4th 1006 (2005); *Morlife, Inc. v. Perry,* 56 Cal.App.4th 1514 (1997).

**B.     CBS Has Established Reasonable Efforts To Maintain Secrecy**

Defendants do not contest CBS's showing that it requires individuals with access to its trade secrets to sign Non-Disclosure agreements, and in this Circuit requiring "employees to sign confidentiality agreements respecting [] trade secrets" alone constitutes "reasonable steps to insure the secrecy [of] this information as required by the UTSA." *MAI Systems Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 521 (9th Cir. 1993); *American Credit Indemnity Co. v. Sacks*, 213 Cal.App.3d 622, 631 (1989) (reversing denial of preliminary injunction).

Instead, Defendants submit a host of declarations to argue that "CBS shared the alleged trade secrets with journalists, fans, and even executives of competing networks." (Opp'n at 21.)  But every single declaration confirms what CBS already stated in its *ex parte* application—that *Big Brother* staff occasionally gives tours of the *Big Brother* stage, but that such tours do not reveal confidential processes.  For example, the YouTube clip Defendants' declarants repeatedly reference (*see* Bock Decl. ¶ 9, Henson Decl. ¶ 13, Rosen Decl. ¶ 40) is four minutes long, of which less than two minutes is shot inside the *Big Brother* MCR and which (consistent with the description in Mr. Wollman's declaration) reveals practically nothing of substance regarding *Big Brother*'s production processes.  *See* http://youtube.com/watch?v=JE1Ank-TVss.  Similarly, in the internet blog referenced by Mr. Rosen, the only sentences possibly relevant to CBS's trade secrets are the few he directly quotes.  (Rosen Decl. ¶¶ 26, 36, 40)  CBS has never disputed that it gives short, behind-the-scenes tours of the *Big Brother* set.  And importantly, *despite submitting multiple declarations from individuals who profess to have knowledge about* Big Brother *tours,* Defendants have utterly failed to refute the sworn statement from a *Big Brother* producer establishing that *Big Brother* "do[es] not discuss

confidential processes, and no tours are taken inside the post-production offices," as well as the fact that "[e]ven for someone who has experience producing a reality television show, it is impossible to decipher [during a tour], among other things, what the Swtichers, Shaders, loggers, and story-producers are doing, or how the story producing process works." (Wollman Decl. ¶ 19.) Even ABC executive Tim Bock admits that his request for access to the master control room during his tour was denied (a request which is wholly inconsistent with his contention that the only reason he sought a tour was to look for stage space). Defendants simply have not refuted CBS's showing that the tours do not destroy confidentiality.

In addition, CBS did not, as Defendants assert, "state[] that it learned the production processes for *Big Brother* from its licensor, Endemol." (Opp'n at 21 (citing Wollman Decl. ¶ 12).) ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████ It is therefore irrelevant whether "Endemol licensees . . . freely post their own versions of [House Guest "Rule Books"] online" (Opp'n at 21), and Defendants do not identify any similarities between these "Rule Books" and the confidential *Big Brother* HouseGuest Manual because they are in fact substantially different than the HouseGuest Manual developed by CBS. (Luedtke Decl. Exhs. A & B (screenshots of websites from *Big Brother* productions in the U.K. and the Philippines referencing different entities' *Big Brother* "rules").)

## C. A Production Injunction Is Necessary To Avoid Additional Misappropriation

Finally, Defendants' suggestion that their misappropriation "is not a basis to shut down the show" (Opp'n at 21-22) is contrary to the law. As the Court held in *O2 Micro*, 299 F. Supp. 2d at 1070, which Defendants rely on in their Opposition, "production injunctions" are appropriate where "trade secrets are inextricably connected to the defendant's [work]" and "the misappropriator cannot be relied upon

1  to unlearn . . . the misappropriated technology." The only reason a production

2  injunction was unwarranted in *O2 Micro* was because the Defendant proffered no

3  evidence of any inextricable connection. *Id.* In contrast, *Glass House* is set to air in

4  less than one week. To think that in six days *Big Brother*'s trade secrets—which to

5  date are the foundation on which *Glass House* is built—can be "un-learned" or have

6  been remediated so that "there is no ongoing threat of use" (Opp'n at 22) is pure

7  fantasy. An injunction against *Glass House* is warranted given the extraordinary

8  ongoing misappropriation already divulged by Defendants in the very limited

9  discovery to date and the likelihood of additional ongoing misappropriation on the part

10  of *Glass House*.

**IV.    Defendants Offer No Reasons Not To Enjoin Their Admitted Destruction of Evidence**

13  Defendants do not dispute that Mr. Rosen has destroyed evidence since this

14  lawsuit was filed. Their only response is that the emails he deleted were allegedly

15  "non-substantive" and "tangentially related to *Glass House.*" (Opp'n at 25.) But it is

16  up to CBS or the Court, *not ABC or Mr. Rosen*, to determine whether the *Glass House*

17  emails are pertinent to this litigation. *Cf. Blankenship v. Hearst Corp.*, 519 F.2d 418,

18  429 (9th Cir. 1975). And if it is true that there is "no ongoing destruction of

19  evidence," as Defendants claim (Opp'n at 25) then an injunction will simply preserve

20  the status quo. Based on Mr. Rosen's past actions, the Court should issue an

21  injunction to ensure that no more relevant evidence is destroyed—by Mr. Rosen, or

22  any other individual or entity.

**V.    The Balance Of Equities Favor CBS, As CBS Will Be Irreparably Harmed Without Injunctive Relief**

25  The "underlying purpose" of a TRO is to "preserv[e] the status quo and

26  prevent[] irreparable harm." *Granny Goose Foods, Inc. v. B'hood of Teamsters &*

27  *Auto Truck Drivers Local No. 70*, 415 U.S. 423, 439 (1974). Here, preserving the

28  status quo demands that CBS not be faced with an infringing show about to air in less

Gibson, Dunn & Crutcher LLP

1   than a week, and that ABC be allowed only "to compete, *in a lawful manner*, with

2   Plaintiff" not employing CBS's trade secrets.  *Richmond Techs., Inc. v. Aumtech*

3   *Business Sol'ns*, No. 11-cv-02460-LHK, 2011 WL 2607158, at *22 (N.D. Cal. July 1,

4   2011) (emphasis added).

5          Other than asserting that CBS's harms can be redressed by money damages,

6   Defendants offer nothing to rebut CBS's showing of irreparable harm.  CBS's harms

7   extend beyond loss of viewership, lower ratings and loss of advertising dollars.  As

8   CBS explained, the cascading harms from infringement of *Big Brother* are

9   undoubtedly difficult to quantify, and as such cannot be remedied by money damages.

10  Because the entire network's summer lineup is affected, *Big Brother* is hampered in its

11  ability to compete against other "house reality" shows, and ABC gets an unquantifiable

12  unfair advantage in making a cheap show.  Bresnan Decl. ¶ 18-21, 23.

13         Meanwhile, Defendants offer a supposed parade of horribles if *Glass House* is

14  not allowed to air.  But Defendants miss the most important point:  any harm to ABC

15  is a direct result of ABC's own illegal conduct and so should not bar injunctive relief.

16  *See Wetzel's Pretzels, LLC v. Johnson*, 797 F.Supp.2d 1020, 1029 (C.D.Cal. 2011)

17  (granting a preliminary injunction, and noting that "[w]hile it is apparent that

18  Defendants would suffer a loss of revenue and that its employees would, in all

19  likelihood, lose their employment, it is Defendants who brought on those risks").

20  Furthermore, the harm that ABC alleges—having its production stopped right before it

21  airs—would undoubtedly be worsened if *Glass House* were pulled off television mid-

22  season, *after* the show began airing.

23         Finally, Defendants' argument about injunctive relief serving as a prior restraint

24  is simply meritless.  A preliminary injunction would not constitute a prior restraint, as

25  the First Amendment does not protect copyright infringement or the misappropriation

26  of trade secrets.  *See Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*, 924

27  F.Supp. 1559, 1575-76 (S.D. Cal. 1996) (rejecting such an argument because

28  "[c]opyright law accommodates the concerns of the First Amendment through its

Gibson, Dunn &
Crutcher LLP

16

1    exclusion of protection for ideas, and through the fair use doctrine"); *DVD Copy*

2    *Control Ass'n, Inc. v. Bunner*, 31 Cal.4th 864, 882 ("The First Amendment does not

3    prohibit courts from incidentally enjoining speech in order to protect [against

4    disclosure of trade secrets.") (citations omitted).  Moreover, the public interest strongly

5    favors injunctions here, as "public policy favors the issuance of injunctions in

6    intellectual property infringement lawsuits," *Nintendo of AM., Inc. v. Lewis Galoob*

7    *Toys, Inc.*, 16 F.3d 1032, 1038 (9th Cir. 1994), and California's trade secret law

8    specifically provides for injunctions in light of the need to "maintain 'standards of

9    commercial ethics,'" *DVD Copy Control*, 31 Cal.4th at 880-81.

## VI.   Conclusion

11       For the foregoing reasons and for those stated in CBS's *Ex Parte* Application,

12    CBS respectfully requests that the Court grant CBS's Application for a TRO and an

13    OSC regarding a preliminary injunction.

15                /s/ Scott A. Edelman

16                Scott A. Edelman

Gibson, Dunn &
Crutcher LLP

17

**Appendix A – Reply**

| CBS's Trade Secret | Defendants' Response | CBS's Reply |
|---|---|---|
| | | |



*(Cont'd on next page)*

| CBS's Trade Secret | Defendants' Response | CBS's Reply |
|---|---|---|
|  |  |  |

*(Cont'd from previous page)*

| CBS's Trade Secret | Defendants' Response | CBS's Reply |
|---|---|---|
|  |  | ███████████████████ |
|  |  | ███████████████████ |
|  | ███████████████ | ███████████████████ |

| CBS's Trade Secret | Defendants' Response | CBS's Reply |
|---|---|---|



| CBS's Trade Secret | Defendants' Response | CBS's Reply |
|---|---|---|
| ███████████████ | | ███████████ |
| ███████████████ | ████████████ | ████████████ |
| ███████████████ | ████████████ | ████████████ |

| CBS's Trade Secret | Defendants' Response | CBS's Reply |
|---|---|---|
| | | |
| | | |



| CBS's Trade Secret | Defendants' Response | CBS's Reply |
|---|---|---|
| | ████████████████████ ████████████████████ ████████████████████ ████████████████████ ████████████████████ ████████████████████ | ████████████████ ██████ |
| ████████████████████ ████████████████████ ████████████████████ ████████████████████ ████████████████████ ████████████████████ ████████████████████ ████████████████████ ████████████████████ | ████████████████████ ████████████████████ ████████████████████ ████████████████████ ████████████████████ ████████████████████ ████████████████████ | ████████████████████ ████████████████████ ████████████████████ ████████████████████ ████████████████████ ████████████████████ ████████████████████ |



| CBS's Trade Secret | Defendants' Response | CBS's Reply |
|---|---|---|
| ███ | ██████████ ███████ | |
| | ██████████████ ██████████████ ████████████ | |
| | ████████████ ███████ | |
| ████████████████ █████████████ █████████████ █████████████ █████████████ █████████████ | ███████████████ █████████████ ██████████████ ████████████ | ██████████████ █████████████ |

| CBS's Trade Secret | Defendants' Response | CBS's Reply |
|---|---|---|
| | | |

| CBS's Trade Secret | Defendants' Response | CBS's Reply |
|---|---|---|
| | | |
| | | |



| CBS's Trade Secret | Defendants' Response | CBS's Reply |
|---|---|---|
| | █████████████ ██████████████ ████████████ ████████████ ███████████ ██████████ | |
| ████████████ ███████████ ██████████ █████████ | ████████████ ████████████ ██████████ █████████ | █████████████ ████████████ ███████████ ██████████ █████████ |

