1  SCOTT A. EDELMAN, SBN 116927
2  SEdelman@gibsondunn.com
   MICHAEL SEITZ, SBN 271136
3  MSeitz@gibsondunn.com
   GIBSON, DUNN & CRUTCHER LLP
4  2029 Century Park East
5  Los Angeles, California 90067-3026
6  Telephone: (310) 552-8500
7  Facsimile: (310) 551-8741

8  THEANE EVANGELIS KAPUR, SBN 243570
9  TKapur@gibsondunn.com
   ANGELIQUE KAOUNIS, SBN 209833
10 AKaounis@gibsondunn.com
   BLAINE H. EVANSON, SBN 254338
11 BEvanson@gibsondunn.com
12 GIBSON, DUNN & CRUTCHER LLP
13 333 South Grand Avenue
   Los Angeles, California 90071-3197
14 Telephone: (213) 229-7000
15 Facsimile: (213) 229-7520

16 Attorneys for Plaintiff,
   CBS BROADCASTING INC.

FILED
CLERK, U.S. DISTRICT COURT

JUL 30 2012

CENTRAL DISTRICT OF CALIFORNIA
BY ___ DEPUTY

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| CBS Broadcasting Inc.,<br><br>Plaintiffs,<br><br>v.<br><br>American Broadcasting Companies, Inc., The Walt Disney Company, Disney Enterprises, Inc., ABC, INC., dba Disney/ABC Television Group, Keep Calm and Carry On Productions, Inc., and | CASE NO. 2:12-CV-04073 GAF (JEMx)<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>(1) COPYRIGHT INFRINGEMENT (17 U.S.C. § 101 *et seq.*);<br><br>(2) TRADE SECRET MISAPPROPRIATION (CAL. CIV. CODE §§ 3426-3426.11); |

DOES 1 to 10, inclusive,

Defendants.

(3) INDUCING BREACH OF CONTRACT;

(4) INDUCING BREACH OF FIDUCIARY DUTY

(DEMAND FOR JURY TRIAL; APPENDIX A [filed under seal])

Plaintiff CBS Broadcasting Inc. ("CBS"), for its First Amended Complaint against defendants American Broadcasting Companies, Inc. ("ABC"), The Walt Disney Company, Disney Enterprises, Inc., ABC, INC. (dba Disney/ABC Television Group), and Keep Calm and Carry On Productions, Inc. (collectively, "Defendants"), hereby brings claims seeking relief for copyright infringement, trade secret misappropriation, inducing breach of contract, and inducing breach of fiduciary duty. CBS alleges on personal knowledge as to all facts known to it, and on information and belief as to all other facts, as follows:

## I. SUMMARY OF THE ACTION

1.     ABC's reality television show, "The Glass House" ("*Glass House*"), which remarkably employs at least 32 former producers and staff from CBS's ground-breaking show *Big Brother*, is an unabashed rip-off of every aspect of *Big Brother* and an obvious attempt by Defendants to capitalize on *Big Brother*'s unique success.

2.     CBS brings this action to halt and recover its damages from Defendants' ongoing infringement of its rights in *Big Brother*. Specifically, CBS seeks to stop Defendants' blatant theft of its copyrightable expression, trade secrets, and other confidential and proprietary information in connection with the development, production, and broadcast of *Glass House*.

3.     *Big Brother* is a ground-breaking reality television show that involves a contest among guests who live in a house and who are filmed continuously, perform

1  challenges and tasks, and vote each other off the show. The show has been
2  enormously successful—in its 13th cycle in 2011, *Big Brother* swept its three weekly
3  time periods (Wednesday, Thursday, and Sunday) in viewers and key demographics.
4  *Big Brother* was the first series of its kind to combine the drama and competition of
5  elimination with the developing television genre of modern observational
6  documentary. *Big Brother* also pioneered the use of live online streaming in reality
7  television. Unlike other reality television shows, *Big Brother* viewers can watch an
8  unedited, live feed from inside the *Big Brother* house both on the internet and, during
9  specified times, on the premium cable channel Showtime.

10      4.    ABC's *Glass House* replicates every key aspect of *Big Brother*,
11  including, among other things, its plot, themes, mood, setting, pace, characters,
12  dialogue, sequence of events, and other concrete elements. The striking and
13  substantial similarities between the two series have not been lost on the media, who
14  have reported that ABC "is copying *Big Brother*" and "knocking off" the highly
15  successful show that CBS has been broadcasting since 2000.

16      5.    In fact, the two series are virtually identical. For example, both shows are
17  reality television competitions in which approximately a dozen non-celebrity
18  individuals of mixed gender and ethnicity live in a large studio-bound "house,"
19  physically isolated from the outside world; occupants form strategic alliances and
20  participate in challenges in an effort to win perks and survive eviction votes; the
21  narrative is an unfolding dramatic story; the last contestant remaining wins a fixed
22  figure prize; and viewer input online and via text messages impacts the unpredictable,
23  constantly evolving narrative. There are many other similarities between the shows,
24  many of which are catalogued in paragraphs 85 through 95. Indeed, there is not a
25  single, material element of *Glass House* which did not first appear in *Big Brother*.

26      6.    In copying *Big Brother*, Defendants did not merely take "stock ideas" or
27  "*scenes a faire*," but stole every aspect of *Big Brother*'s tangible creative expression.
28  Although both *Big Brother* and *Glass House* are "reality" television, the content that

1    appears online and in broadcast episodes actually results in large part from decisions

2    made by the shows' creative teams—both in the constraints they put on the contestants

3    and in post-production editing—which embody the shows' creative expression.

4    Moreover, the combination of elements in *Big Brother* was the first of its kind and,

5    prior to *Glass House,* had no analogue in the reality television genre. *Glass House*

6    stole this unique combination of elements in toto.

7         7.    In copying *Big Brother*, Defendants have had an unprecedented and

8    troubling degree of access to CBS's copyrightable expression, as well as CBS's

9    protected trade secrets and other confidential and proprietary information related to

10   the behind-the-scenes development, filming, and production of *Big Brother*. CBS is

11   informed and believes that *Glass House*'s most senior positions and most critical

12   functions are being staffed by former producers and staff of *Big Brother*, including at

13   least 32 individuals identified below, and that these individuals—at the

14   encouragement of Defendants—are actively disclosing CBS's trade secrets and

15   confidential information to Defendants in violation of broad and binding non-

16   disclosure agreements these individuals signed in connection with their work on *Big*

17   *Brother*.

18        8.    CBS is informed and believes that *Glass House* is thus being developed

19   using the trade secrets and other confidential and proprietary information and methods

20   Defendants and these former employees learned from *Big Brother*. These trade secrets

21   were developed after 13 years of trial and error in response to *Big Brother*'s

22   unprecedented production format and schedule. *Big Brother* is the only television

23   series (in the reality TV genre or otherwise) where individuals are filmed 24 hours per

24   day by hidden cameras, with very limited interaction between the contestants and

25   production staff, while living in an environment that is physically isolated from the

26   outside world, where live footage is streamed to the internet, and where the captured

27   footage is edited into a narrative before production of the rest of the season is

28   complete and before the producers know how the contest will turn out. Producing

Gibson, Dunn &
Crutcher LLP

4

1   such a show poses enormous challenges, and, to meet them, CBS developed the trade-

2   secret processes identified in the accompanying appendix and in paragraphs 34

3   through 41. CBS is informed and believes that Defendants have elicited these

4   processes from the former *Big Brother* employees now working on *Glass House* who

5   are or were in possession of CBS's trade secrets. Indeed, Defendants have already

6   conceded acts of misappropriation.

7   　　　9.   CBS made written demand that Defendants stop development of *Glass

8   House* and cease disclosure and use of CBS's trade secrets and other confidential

9   information, but Defendants persisted in their course of conduct and have now

10  broadcast six episodes of *Glass House*, as well as numerous hours of online feeds.

11  CBS therefore brings this action to obtain preliminary and permanent injunctive relief

12  and restitution, and to recover compensatory and punitive damages.

### II. JURISDICTION AND VENUE

14  　　　10.   This Complaint arises under the federal Copyright Act, 17 U.S.C. §§ 101

15  *et seq.*, as amended, and the statutory and common law of the State of California.

16  　　　11.   This Court has subject-matter jurisdiction over this dispute under 28

17  U.S.C. § 1331 (federal question) because the claims asserted arise under the Copyright

18  Act. The Court also has subject matter jurisdiction under 28 U.S.C. § 1367(a)

19  (supplemental jurisdiction) over the supplemental state-law claims.

20  　　　12.   Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2)

21  because a substantial part of the events giving rise to the claims asserted herein

22  occurred in this District. Venue is also proper under 28 U.S.C. § 1391(b)(1) because

23  Defendants are subject to personal jurisdiction in this District and therefore "reside" in

24  this District as that term is defined in 28 U.S.C. § 1391(c).

### III. THE PARTIES

26  　　　13.   CBS is a corporation organized under the laws of New York and

27  maintains its principal place of business in New York, New York. CBS is the

28

1    exclusive U.S. licensee of the hit television series *Big Brother* and broadcasts the

2    series on the CBS Television Network.

3        14.    On information and belief, Defendant ABC is a corporation organized

4    under the laws of Delaware and maintains its principal place of business at 77 West

5    66th Street, New York, New York.  ABC produces and broadcasts television

6    programming in the United States.  ABC broadcasts *Glass House*.

7        15.    On information and belief, Defendant The Walt Disney Company is a

8    corporation organized under the laws of Delaware and maintains its principal place of

9    business at 500 South Buena Vista Street, Burbank, California.  The Walt Disney

10   Company is the ultimate legal parent of ABC.  CBS is informed and believes, and on

11   that basis alleges, that The Walt Disney Company is involved in the development of

12   *Glass House*.

13       16.    On information and belief, Defendant Disney Enterprises, Inc. is a

14   corporation organized under the laws of Delaware and maintains its principal place of

15   business at 500 South Buena Vista Street, Burbank, California.  CBS is informed and

16   believes, and on that basis alleges, that Disney Enterprises, Inc. is involved in the

17   development of *Glass House*.

18       17.    On information and belief, Defendant ABC, INC. is a corporation

19   organized under the laws of New York and maintains its principal place of business at

20   77 West 66th Street, New York, New York.   On information and belief, ABC, INC.

21   does business in California under the fictitious name "Disney/ABC Television

22   Group."  CBS is informed and believes, and on that basis alleges, that ABC, INC. is

23   involved in the development of *Glass House*.

24       18.    On information and belief, Defendant Keep Calm and Carry On

25   Productions, Inc. ("Keep Calm") is a corporation organized under the laws of

26   Delaware and maintains its principal place of business at 500 South Buena Vista

27   Street, Burbank, California.  CBS is informed and believes that Keep Calm is an in-

28   house production company owned by ABC, The Walt Disney Company, or ABC's

Gibson, Dunn &
Crutcher LLP

other affiliates. Keep Calm is responsible for the day-to-day production of *Glass House*.

19. The true capacities, whether individual, corporate, associate or otherwise, of defendants sued herein as DOES 1 to 10, inclusive, are unknown to CBS and CBS therefore sues such DOE defendants by such fictitious names. When their true names and capacities are ascertained, CBS will amend the Complaint by asserting their true names and capacities herein. CBS is informed and believes, and thereon alleges, that each of the fictitiously named defendants is responsible in some manner for the occurrences alleged in this Complaint, and that CBS's damages as alleged in this Complaint were proximately caused by such fictitious defendants.

20. CBS is informed and believes, and thereon alleges, that at all times herein mentioned, each of the Defendants was acting as an agent, servant, employee, representative of or joint venturer with the other Defendants, each acting under the direction and control of said co-defendants and within the course and scope of such agency, service, employment, or joint venture. At all times mentioned herein the acts of Defendants, and each of them, were authorized and ratified by their co-defendants.

## CBS's Hit Show *"Big Brother"*

21. CBS is the exclusive U.S. licensee of *Big Brother*, which it has broadcast on the CBS Television Network since 2000. The show was first pitched to CBS in or around 1999. At the time, *Big Brother* was presented to CBS with an established format for a show that would be the first of its kind in the United States, and a production formula outlined by several agreements (dated in 2000). CBS was also promised a series "Bible," setting forth a complete description of the competitions to take place between and among the HouseGuests; rules governing those competitions; the procedures used by the licensor in selecting and safeguarding the secrecy of questions or other material used on or in connection with the show; and the methods and standards by which HouseGuests are selected. Pursuant to those initial 2000 agreements, CBS and the licensor of the program agreed that it was vitally important

1  for the success of the series that each party keep strictly confidential all of the terms

2  and conditions relating to the agreement and the production and broadcast of the series

3  for the First, Second, and each subsequent Cycle. This confidentiality obligation

4  included, without limitation, nondisclosure to any third party of information relating

5  to all creative decisions relating to the production, content, and format of the series

6  episodes, and the identity of any persons who were selected as cast members.

7      22.    Based on the 2000 agreements and representations concerning the series

8  format, CBS decided to invest millions of dollars up front in production costs, and to

9  among other things, become the exclusive licensee of the show in the United States.

10  This decision hinged in large part on the promise that *Big Brother* was based on a

11  proven formula that could be executed in the United States for the first time by CBS—

12  as demonstrated by the initial seasons of the show, the Bible promised to CBS, and the

13  manuals created by CBS through the production of the show during those seasons,

14  which subsequently were updated by CBS with each new season. Without this proven

15  formula, the exclusive right to tailor it and further refine it as needed to address the

16  demands of producing network television for an American audience and the creative

17  inspiration of the network, it is unlikely that CBS would have acquired these rights

18  and produced the show.

19      23.    *Big Brother* is a reality television series in which a group of people live

20  together in a large house, isolated from the outside world. The contestants are filmed

21  continuously.

22      24.    Each cycle of the series begins with between 12 and 14 contestants

23  (referred to as "houseguests"). Over the course of three months, contestants survive

24  periodic evictions. The last contestant standing is the winner.

25      25.    Evictions occur approximately once per week. The contestant designated

26  the "head of household" nominates a number of fellow contestants whom he or she

27  wishes to see evicted from the house. The contestants then vote to evict each other,

28  and the nominated contestant with the most votes is evicted (unless a contestant uses a

Gibson, Dunn &
Crutcher LLP

1   "power of veto," where a contestant can save a nominee, causing the head of

2   household to name a replacement nominee).

3       26.     After the votes are tallied, the "evictee" leaves the house.   As far back as

4   Season 3, some expelled *Big Brother* contestants have been permitted to return to the

5   house.

6       27.     The weekly tasks and competitions, which are set by *Big Brother*, are a

7   major part of the contest.  The tasks are designed to test contestants' abilities to work

8   as a team and their community spirit.  Contestants who lose the tasks and competitions

9   are often nominated to be evicted from the house.

10      28.     Teams are often an important element of *Big Brother*.  In one season,

11  contestants competed in teams.  And in many seasons, contestants are assigned to

12  compete in challenges on teams, with the losing team suffering negative

13  consequences.

14      29.     Throughout the cycle, the contestants are filmed in the "Diary/Confession

15  Room," where they individually convey their thoughts, feelings, and frustrations, and

16  reveal their nominees for eviction.

### ***Big Brother*'s Unique Interactive Features**

18      30.     *Big Brother* pioneered a series of interactive features through which

19  viewers of *Big Brother* are given input into the show, including which contestants are

20  evicted from the house, and in some cycles of the show, which contestants are allowed

21  back into the house after they have been eliminated.

22      31.     Although the show typically broadcasts daily updates in the evening,

23  viewers also can watch a continuous, 24-hour feed from multiple cameras on the web.

24      32.     *Big Brother* also includes a contestant called "America's Player," who is

25  given assignments, unknown to the other houseguests, through votes from the viewing

26  public.  The public also votes on which nominated contestant America's Player should

27  vote off and campaign to get evicted.

28

Gibson, Dunn &
Crutcher LLP

9

a. In Season 8, *Big Brother* first showcased "America's Player." In that season, viewers voted on, among other things, whose bed America's Player should enter while sleepwalking, whom America's Player should vandalize, which catchphrase America's Player should introduce, whom America's Player should vote with on the show, which contestant America's Player should flatter, whom should receive the "silent treatment" from America's Player, whom America's Player should kiss, and whom America's Player should mimic. The viewer votes were cast on CBS.com or via text messaging.

33.    In certain seasons of *Big Brother*, contestants have been permitted to communicate with the public via an internet blog.

### *Big Brother*'s Behind-The-Scenes Production Trade Secrets

34.    Until *Glass House*, *Big Brother* adhered to a production format and schedule that was unprecedented in television. Other reality television shows are either shot live or are edited to create episodes in post-production (*i.e.* after filming ends). Before *Glass House*, *Big Brother* was the only television series (in the reality TV genre or otherwise) where individuals are filmed 24 hours per day by hidden cameras, with very limited interaction between the contestants and production staff, while living in an environment that is physically isolated from the outside world, where live footage is streamed to the internet, and where the captured footage is edited into a narrative before production of the rest of the season is complete and before the producers know how the contest will turn out.

35.    Producing such a show poses enormous challenges. For example, *Big Brother* requires special rules to govern interactions between contestants and producers, and producers must be trained to capture the best "story" (an industry term for compelling narrative) from 50+ cameras throughout the house 24 hours per day and to edit this voluminous footage into a dramatic episode on a short time-frame and

Gibson, Dunn & Crutcher LLP

without knowing how the rest of competition will play out. To address these challenges, *Big Brother* developed numerous confidential, trade secret production processes that allow it to produce the show. *See* Appendix A, No. 7. For example, after years of trial and error, *Big Brother* has developed special rules severely restricting interaction between contestants on the show and the crew. These rules simply do not exist on other reality TV shows like *Survivor* or *Amazing Race*, in large part because those shows do not have the same "fly on the wall" format that could be tainted or ruined by potential crew influence on the story.

36.  *Big Brother* also has developed lengthy compilations of materials (or "manuals") (the *Big Brother* HouseGuest Manual, Producers Binder, Switchers Manual, and Story Producers Handbook) that catalogue the vast logistical considerations concerning filming, editing, and producing a reality television show that tapes 24 hours per day and on *Big Brother's* unique, fast-paced schedule. *See id.*, No. 1. *Big Brother* compiled these manuals based on 13 years of trial-and-error, and the manuals have been updated every year since season 2 of the show. The manuals are themselves valuable trade secrets because a competitor could simply use the manuals to replicate the show without having to undergo years of trial and error (already undertaken by CBS) to produce the same show.

37.  These trade secret processes and compilations are described in detail in the accompanying appendix. *Big Brother* producers and staff are exposed to all of these trade secrets, which are owned by CBS and protected by California law.

38.  Moreover, although none of these protected trade secrets can be discovered or "reverse engineered" merely by watching *Big Brother* (they can be ascertained only by producers and staff working "behind the scenes" on *Big Brother*) they have an enormous impact on the content of the episodes, on the look and feel of *Big Brother*, and therefore on the expression contained in each episode of *Big Brother*. Specifically, *Big Brother*'s production and editing techniques are the key to creating the fly-on-the-wall, voyeuristic feel that has made *Big Brother* so successful. And the

1  processes involved with editing and airing *Big Brother* episodes before the end of the
2  competition are crucial for viewer interaction and creating the feeling among *Big*
3  *Brother*'s viewers that anything can happen next.

4      39.    CBS and its business partners take extreme care to protect the
5  confidentiality of the trade secrets related to the production of *Big Brother*.
6  Producers and other staff of *Big Brother* are required to sign non-disclosure
7  agreements with a production company in connection with their work on each cycle of
8  *Big Brother*.  These non-disclosure agreements specifically provide that CBS is a
9  third-party beneficiary that is entitled to enforce the agreement.

10      40.    In pertinent part, the non-disclosure agreements specify that if a
11  signatory's work on *Big Brother* would reveal "confidential and/or proprietary
12  information and/or trade secrets ..., which may never be intended for dissemination to
13  the general public at any time," that they would not "publish, reveal, disseminate,
14  disclose, or cause to be published, revealed, disseminated or disclosed ... any
15  Confidential Information." "Confidential Information" is defined as contestant
16  identities and "all other confidential information and trade secrets." These non-
17  disclosure agreements require all signatories to keep CBS's trade secrets "fully
18  confidential in perpetuity."

19      41.    Moreover, the *Big Brother* soundstage is accessible only to authorized
20  personnel, subject to non-disclosure agreements, by way of key-cards.  Also, there
21  typically are guards stationed at the entrance to the CBS lot and the *Big Brother*
22  soundstage to bar unauthorized individuals from entering.

23      **Defendants Set Out To Copy *Big Brother* And Steal Its Trade Secrets**

24      42.    CBS is informed and believes that Defendants have engaged in a
25  calculated effort to obtain access to *Big Brother*'s confidential, behind-the-scenes
26  trade secrets and to create a show that is substantially similar to *Big Brother* by,
27  among other things, purposefully filling *Glass House*'s most senior positions and most
28  critical functions with former producers and other staff of *Big Brother*.

Gibson, Dunn &
Crutcher LLP

12

43. Corie Henson, a former CBS employee and Supervising Producer on *Big Brother*, is presently ABC's Vice President of Alternative Programming and, on information and belief, is intimately involved in developing *Glass House*.

44. On *Big Brother* seasons 6 and 7, Ms. Henson managed a "story team" (a group tasked with creating a plot narrative from video of the *Big Brother* contestants) of up to seven people and was responsible for, among other things, putting together scripts, creating "story packages," and writing the rules for the *Big Brother* "challenges." Ms. Henson was also trained on the confidential, proprietary processes necessary to turn an hour of primetime television around in only 24 or 48 hours.

45. Approximately two years ago, Ms. Henson joined ABC and, on information and belief, immediately began developing *Glass House*.

46. CBS is informed and believes that, while (unbeknownst to CBS) Ms. Henson was developing *Glass House*, she and an ABC executive, Tim Bock, asked for and received a tour of the *Big Brother* soundstage in an attempt to learn confidential processes associated with producing *Big Brother*. Although it is impossible for Ms. Henson or Mr. Bock to have discerned from this single tour any confidential processes, Mr. Bock repeatedly asked to be allowed to examine the *Big Brother* Master Control Room, which CBS is informed and believes was an attempt to gain insight into *Big Brother*'s production processes. This request was denied.

47. CBS is informed and believes that, while Ms. Henson was developing *Glass House*, she attempted to obtain confidential information about how to construct the *Big Brother* house from at least one individual who worked on *Big Brother*. Having previously worked on *Big Brother*, and having signed several *Big Brother* non-disclosure agreements herself, Ms. Henson knew or should have known at the time she attempted to obtain this information that any current or former *Big Brother* staff member would be prohibited from disclosing *Big Brother*'s trade secrets to her as she requested.

48.     From its inception, the development of *Glass House* was led by other former key *Big Brother* staff in addition to Ms. Henson. On information and belief, *Glass House* was largely developed in early creative meetings involving four individuals: Ms. Henson, Kenny Rosen (*Glass House*'s show-runner), Michael O'Sullivan (a producer), and Marie Mitchell. Three of these individuals (Ms. Henson, Mr. Rosen, and Mr. O'Sullivan) are former high-level *Big Brother* employees who signed NDAs in connection with their work on *Big Brother* containing the provisions identified above in paragraphs 39 through 40.

49.     Kenny Rosen is the former Co-Executive Producer of *Big Brother* (he worked on *Big Brother* seasons 3 through 8). Mr. Rosen was trained on *Big Brother*'s confidential and proprietary processes, including how to turn live video of the *Big Brother* contestants into "story packages" and on the processes necessary to turn an hour of primetime television around in only 24 or 48 hours. In that role, Mr. Rosen had access to, and possession of, all of the confidential *Big Brother* manuals cataloguing the vast logistical considerations concerning filming, editing, and producing *Big Brother*, and Mr. Rosen was tasked with putting those confidential processes into practice in order to produce *Big Brother*. Mr. Rosen also was involved in the overall creative direction of *Big Brother* and took part in casting and script meetings.

50.     Michael O'Sullivan is a former Supervising Producer of *Big Brother*, having worked on the show during seasons 4 and 7 through 13. On *Big Brother*, Mr. O'Sullivan was responsible for the concept, design, and execution of the series' "challenges"—a critical creative element of the show where contestants take part in unique competitions. In that role, Mr. O'Sullivan had access to, and possession of all of the confidential *Big Brother* manuals cataloguing the vast logistical considerations concerning filming, editing, and producing *Big Brother*, and Mr. O'Sullivan was tasked with putting those confidential processes into practice in order to produce *Big Brother*'s "challenges."

51.     On information and belief, Defendants made no pretense of seeking to independently create *Glass House* during these early creative meetings involving these three former *Big Brother* high-level employees.  Although Defendants have offered the *post hoc* explanation that during these meetings *Glass House* was conceived as a reality television show based on the teenage fiction series *The Hunger Games*, Defendants have subsequently abandoned any contention that *Glass House* is more similar to *The Hunger Games* than *Big Brother*, and CBS is informed and believes that the intent of these meetings was to create a show that copied *Big Brother*.

52.     Indeed, CBS is informed and believes that while *Glass House* was being developed, Mr. Rosen went back and watched *Big Brother* footage over a period of two days to remind himself of the story-telling in *Big Brother*.  And CBS is informed and believes that *Glass House*'s focus on "viewer interactivity" was purposefully copied from Season 8 of *Big Brother* (the "America's Player" season described in paragraph 12 above), which is the last season Mr. Rosen worked on *Big Brother* and for which he received production credits.  Notably, ABC has not even attempted to identify a single employee as the "creator" of the show in its credits, thereby effectively conceding that the Defendants did not independently develop the show.

53.     CBS is also informed and believes, and on that basis alleges, that Mr. Rosen, Ms. Henson, and Mr. O'Sullivan subsequently approached numerous other *Big Brother* staff about leaving *Big Brother* and helping develop, film, and produce *Glass House*.  Indeed, on information and belief, Mr. Rosen approached former *Big Brother* employees to work on *Glass House* by expressly emphasizing similarities between *Glass House* and *Big Brother* and the employees' experience with *Big Brother*'s confidential production processes.

54.     In addition to Ms. Henson, Mr. Rosen, and Mr. O'Sullivan, CBS is informed and believes that at least 29 other former *Big Brother* employees, who had access to trade secret information, are now or have been employed on *Glass House*.

Gibson, Dunn &
Crutcher LLP

55.    James MacNab was a Supervising Producer of *Big Brother* for seasons 4, 7, 8, and 10. He is now involved in the production of *Glass House* as a Supervising Producer. Mr. MacNab signed a non-disclosure agreement in connection with his work for CBS on *Big Brother*, agreeing to all the terms set forth in paragraphs 39 through 40.

56.    Max Poris was a Competition Segment Producer of *Big Brother* for seasons 7, 8, and 10. He is now involved in the production of *Glass House* as a Senior Producer. Mr. Poris signed a non-disclosure agreement in connection with his work for CBS on *Big Brother*, agreeing to all the terms set forth in paragraphs 39 through 40.

57.    Mark Bettencort worked in the competition department of *Big Brother* during seasons 8 through 12. He is now involved in the production of *Glass House* as a Challenge Segment Producer. Mr. Bettencort signed a non-disclosure agreement in connection with his work for CBS on *Big Brother*, agreeing to all the terms set forth in paragraphs 39 through 40.

58.    Danny Schrader worked in the competition department for *Big Brother* seasons 8 through 9 and season 11. He is now involved in the production of *Glass House* as a Supervising Challenge Producer. Mr. Schrader signed a non-disclosure agreement in connection with his work for CBS on *Big Brother*, agreeing to all the terms set forth in paragraphs 39 through 40.

59.    Adam Sheldon worked in the competition department during *Big Brother* Season 13. He is now involved in the production of *Glass House* as a Challenge Associate Producer. Mr. Sheldon signed a non-disclosure agreement in connection with his work for CBS on *Big Brother*, agreeing to all the terms set forth in paragraphs 39 through 40.

60.    Anthony ("Tony") Gonzales worked as a Lead Switcher on *Big Brother* seasons 1 through 12. He is now involved in the production of *Glass House* as a Director, a position on *Glass House* which CBS is informed and believes performs the

1 | same confidential functions as a *Big Brother* Switcher. Mr. Gonzales signed a non-
2 | disclosure agreement in connection with his work for CBS on *Big Brother*, agreeing to
3 | all the terms set forth in paragraphs 39 through 40.

4 |     61.    Gary ("Buzz") Nowers worked as a Lead Switcher on *Big Brother*
5 | seasons 4 through 5 and seasons 7 through 13. He is now involved in the production
6 | of *Glass House* as a Technical Supervisor. Mr. Nowers signed a non-disclosure
7 | agreement in connection with his work for CBS on *Big Brother*, agreeing to all the
8 | terms set forth in paragraphs 39 through 40.

9 |     62.    Kevin Faust worked as a Lead Shader on *Big Brother* seasons 2 through
10 | 13. He is now involved in the production of *Glass House* as a Robo Cam operator, a
11 | position on *Glass House* which CBS is informed and believes performs the same
12 | confidential functions as a *Big Brother* Shader. Mr. Faust signed a non-disclosure
13 | agreement in connection with his work for CBS on *Big Brother*, agreeing to all the
14 | terms set forth in paragraphs 39 through 40.

15 |     63.    Heather Bennett worked as a Shader on *Big Brother* seasons 6 through
16 | 13. She is now involved in the production of *Glass House* as a Robo Cam operator, a
17 | position on *Glass House* which CBS is informed and believes performs the same
18 | confidential functions as a *Big Brother* Shader. Ms. Bennett signed a non-disclosure
19 | agreement in connection with his work for CBS on *Big Brother*, agreeing to all the
20 | terms set forth in paragraphs 39 through 40.

21 |     64.    Tony Kalatzis worked as a Shader on *Big Brother* seasons 5 through 13.
22 | He is now involved in the production of *Glass House* as a Robo Cam operator, a
23 | position on *Glass House* which CBS is informed and believes performs the same
24 | confidential functions as a *Big Brother* Shader. Mr. Kalatzis signed a non-disclosure
25 | agreement in connection with his work for CBS on *Big Brother*, agreeing to all the
26 | terms set forth in paragraphs 39 through 40.

27 |     65.    Mark Gonzales worked as a Shader on *Big Brother* seasons 7 through 8
28 | and seasons 10 through 13. He is now involved in the production of *Glass House*

1  where he performs "Digital Utility."  Mr. Gonzales signed a non-disclosure agreement

2  in connection with his work for CBS on *Big Brother*, agreeing to all the terms set forth

3  in paragraphs 39 through 40.

4        66.    Roy Walker worked as a Camera Operator on *Big Brother* seasons 3

5  through 13.  He is now involved in the production of *Glass House* as a Camera

6  Operator.  Mr. Walker signed a non-disclosure agreement in connection with his work

7  for CBS on *Big Brother*, agreeing to all the terms set forth in paragraphs 39 through

8  40.

9        67.    Martin Mourino worked as a Jib Camera Operator on *Big Brother* seasons

10  3 through 13.  He is now involved in the production of *Glass House* as a Camera

11  Operator.  Mr. Mourino signed a non-disclosure agreement in connection with his

12  work for CBS on *Big Brother*, agreeing to all the terms set forth in paragraphs 39

13  through 40.

14        68.    David Vanacore worked as a music composer on *Big Brother* seasons 6

15  through 13.  He was previously involved on the development of *Glass House*.  Mr.

16  Vanacore signed a non-disclosure agreement in connection with his work for CBS on

17  *Big Brother*, agreeing to all the terms set forth in paragraphs 39 through 40.

18        69.    Kevin Benson worked as an Editor for CBS on *Big Brother* seasons 12

19  through 13 and during other prior seasons of *Big Brother*.  He is now involved in the

20  production of *Glass House* as an Editor.  Mr. Benson signed a non-disclosure

21  agreement in connection with his work for CBS on *Big Brother*, agreeing to all the

22  terms set forth in paragraphs 39 through 40.

23        70.    Joe Kroll worked as a Switcher for CBS on *Big Brother* seasons 11

24  through 13.  He is now involved in the production of *Glass House* where he performs

25  "Digital Utility."  Mr. Kroll signed a non-disclosure agreement in connection with his

26  work for CBS on *Big Brother*, agreeing to all the terms set forth in paragraphs 39

27  through 40.

28

71.     Joe Cauley worked as an Editor on *Big Brother* seasons 6 through 8 and seasons 10 through 12. He is now involved in the production of *Glass House* as an Editor. Mr. Cauley signed a non-disclosure agreement in connection with his work for CBS on *Big Brother*, agreeing to all the terms set forth in paragraphs 39 through 40.

72.     Carley Simpson worked in the Story Department on *Big Brother* Season 11. She is now involved in the production of *Glass House* as a Story Producer. Ms. Simpson signed a non-disclosure agreement in connection with her work for CBS on *Big Brother*, agreeing to all the terms set forth in paragraphs 39 through 40.

73.     Steven Booth worked on *Big Brother* Season 7. He is now involved in the production of *Glass House* as an Internet Co-Producer. Mr. Booth signed a non-disclosure agreement in connection with his work for CBS on *Big Brother*, agreeing to all the terms set forth in paragraphs 39 through 40.

74.     Mitch Wilson worked as an Editor on *Big Brother* seasons 7 and 8. He is now involved in the production of *Glass House* as an Editor. Mr. Wilson signed a non-disclosure agreement in connection with his work for CBS on *Big Brother*, agreeing to all the terms set forth in paragraphs 39 through 40.

75.     Brian Phillips worked as an Editor on *Big Brother* seasons 6 and 7. He is now involved in the production of *Glass House* as an Editor. Mr. Phillips signed a non-disclosure agreement in connection with his work for CBS on *Big Brother*, agreeing to all the terms set forth in paragraphs 39 through 40.

76.     Jordan Ackerman worked as a Production Assistant on *Big Brother* Season 6. He is now involved in the production of *Glass House* as an Editor. Mr. Ackerman signed a non-disclosure agreement in connection with his work for CBS on *Big Brother*, agreeing to all the terms set forth in paragraphs 39 through 40.

77.     Gigi D'Amore worked as a Logger and Hot Sheet Author on *Big Brother* seasons 4 through 8. She is now involved in the production of *Glass House* as a Story Producer. Ms. DiMorris signed a non-disclosure agreement in connection with her

work for CBS on *Big Brother*, agreeing to all the terms set forth in paragraphs 39 through 40.

78.     Rebekah Fry worked as in the Story Department on at least two seasons of *Big Brother*. She is now involved in the production of *Glass House* as a Co-Executive Producer. Ms. Fry signed a non-disclosure agreement in connection with her work for CBS on *Big Brother*, agreeing to all the terms set forth in paragraphs 39 through 40.

79.     Andrew Krukowsi worked on *Big Brother* seasons 9 through 11. He is now involved in the production of *Glass House* as an Online Editor. Mr. Miller signed a non-disclosure agreement in connection with his work for CBS on *Big Brother*, agreeing to all the terms set forth in paragraphs 39 through 40.

80.     Stephen Miller worked on *Big Brother* seasons 11 through 12. He is now involved in the production of *Glass House* as a Hot Sheet Associate Producer. Mr. Krukowsi signed a non-disclosure agreement in connection with his work for CBS on *Big Brother*, agreeing to all the terms set forth in paragraphs 39 through 40.

81.     Ky Matthes worked on multiple seasons of *Big Brother* as a Lead Switcher. Matthes is now involved in the production of *Glass House* doing "Digital Utility." Matthes signed a non-disclosure agreement in connection with prior work for CBS on *Big Brother*, agreeing to all the terms set forth in paragraphs 39 through 40.

82.     Allen Pineda worked on multiple seasons of *Big Brother*. He is now involved in the production of *Glass House* as a Robo Cam operator. Mr. Pineda signed a non-disclosure agreement in connection with his work for CBS on *Big Brother*, agreeing to all the terms set forth in paragraphs 39 through 40.

83.     Michael Potts worked on at least five seasons of *Big Brother* as a Production Manager and Production Coordinator. He is now involved in the production of *Glass House* as a Production Manager. Mr. Potts signed a non-disclosure agreement in connection with his work for CBS on *Big Brother*, agreeing to all the terms set forth in paragraphs 39 through 40.

1    84.    CBS is also informed and believes, and on that basis alleges, that

2  Defendants, through Kenny Rosen and others, have approached additional current or

3  former *Big Brother* employees to work on *Glass House* and that some of these

4  additional individuals are already working on *Glass House* or will do so in the near

5  future.

6                  **_Glass House_ Is Substantially Similar To _Big Brother_**

7    85.    On or about April 30, 2012, ABC publicly announced it was developing

8  *Glass House*, and the broadcast version of *Glass House* debuted on June 18, 2012.  On

9  information and belief, the show will run through August 20, 2012.

10    86.    Consistent with Defendants' intention to copy *Big Brother*, *Glass House*

11  is nearly identical to *Big Brother* in every way.

12    87.    *Glass House*, like *Big Brother*, involves 14 contestants living together in

13  a house rigged with cameras.  And as in *Big Brother*, contestants on *Glass House* face

14  eviction, with the last person standing winning a six-figure cash prize.

15    88.    *Glass House* employs the same plot, themes, mood, setting, pace,

16  characters, dialogue, sequence of events, and other concrete elements making up *Big*

17  *Brother*.

18    a.  <u>PLOT</u>:  Both shows are about contestants who are physically isolated in a

19       "house" 24 hours per day and who compete with one another, engage in

20       challenges, and form alliances to avoid expulsion and obtain a grand

21       prize by being the last player left in the house.  Moreover, the story

22       "arc"—both over the course of an entire season and over the course of an

23       individual episode—is identical to that used on *Big Brother*.  *Glass*

24       *House* uses pre-recorded observations and contestant back-stories as

25       footnotes for character behavior and bookends to scenes in a way that is

26       identical to *Big Brother*; no effort has been made to find a different,

27       distinctive way of presenting annotative material.  Further, episodes of

28       *Big Brother* and *Glass House* both routinely feature as plot elements

Gibson, Dunn &
Crutcher LLP

1    clandestine deals in bedrooms with fly-on-the-wall camera work, less

2    secretive kitchen negotiations between members of different "alliances,"

3    obligatory "party time" for the contestants, and contestant evictions and

4    reinstatements.  In addition, by permitting and encouraging on-set

5    "showmances," the *Glass House* producers have embraced another

6    proven *Big Brother* plot element.  After just four episodes, *Glass House*

7    featured as a major plot element a "hook-up" between two characters

8    (Kevin and Erica) that then resulted in betrayal:  shortly after the two

9    shared an intimate moment, Kevin voted to evict Erica.  This copies a

10   dynamic that goes back to *Big Brother* Season Five, when Drew was

11   involved with Diane and voted her off; to Season Six, when James and

12   Sarah had a showmance and he used his "Power of Veto" to save himself

13   instead of her; and many others.

14   b.  <u>CHARACTERS</u>:  Both shows use 12-14 contestants of varied gender,

15   age, and ethnicity who interact as teammates and opponents.  Although

16   the characters in both shows are real people, the casting on *Glass House*

17   clearly duplicates the numbers and mix of the contestants from *Big*

18   *Brother*.  In both shows, there is an obligatory older player (Jerry in *Big*

19   *Brother* Season Ten; Mike on *Glass House*) and an openly gay player

20   (Steven in *Big Brother* Season Ten; Jeffrey on *Glass House*).  Both shows

21   use a core of mixed-ethnicity, geographically diverse twentysomethings

22   as contestants, and both shows blend equal parts attractive young men

23   and women, and aggressive and passive-aggressive contestants in the

24   same way.  Both shows involve a character who (at the viewers' behest)

25   acts as a "villain" and purposefully creates havoc and conflict among the

26   other contestants.  Both shows use a female voice on a video monitor in

27   the house's living room who exerts the same drop-everything influence

28   on the contestants.  Both shows use a strong male voice—not a hostess—

Gibson, Dunn &
Crutcher LLP

1    to do announcer recaps.  And both shows feature guest-star characters

2    from other television series (in episode three of *Glass House*, *The*

3    *Bachelor* celebrities Kenley and Kiptyn visit the house to cross-promote

4    their show; CBS did the same on *Big Brother* Season Thirteen when

5    David Hasselhoff visited the house to plug his new series *Same Name*).

6    c.  <u>THEMES</u>:  Both shows are about trust, betrayal, ambition,

7    disappointment, bonding, competitiveness, and affection in a structured

8    competition and hidden camera setting.  Both shows are voyeuristic,

9    allow viewers to vote to influence the action, and are marked by an

10   unpredictable, anything-can-happen-next feel.

11   d.  <u>MOOD</u>:  Both shows are characterized by tension, drama, and paranoia

12   (which is magnified in the confines of the house) over which contestant

13   will be eliminated, whom the contestant(s) will nominate for eviction, and

14   the interactions between the contestants.  Like *Big Brother*, *Glass House*

15   contestants appear to have been instructed to "go big" in their reactions to

16   events in the house:  contestants act stoically intense, hands-on-the-head

17   astonished, overwrought, mouth-agape, etc.  These dramatic expressions

18   are accentuated by the cameras and are used to extend the drama of

19   pending announcements—a technique *Big Brother* has used for years to

20   create its dramatic mood.  Visually, *Glass House* also mimics the *Big*

21   *Brother* "going to quasi-black-and-white" technique to mark a flashback

22   or a movement from the ongoing plot.

23   e.  <u>DIALOGUE</u>:  Although both shows use unscripted dialogue, the

24   constraints on the contestants, and producers' purposeful casting choices,

25   result in substantially similar dialogue.  The dialogue is marked by

26   hushed conversations about alliances and strategy and is colloquial and

27   conversational.  Moreover, in both shows whispered dialogue is often

28   enhanced with on-air subtitles.  Given the shows' cutting-edge

1    technology, this is a creative choice not a technical necessity; both shows

2    are capable of enhancing the audio so it is audible.  They use subtitles

3    and hard-to-hear dialogue instead to create a voyeuristic feel.  Further,

4    censored dialogue is presented in exactly the same way on both shows—

5    the sound drops out and the contestant's mouth is blurred to prevent lip-

6    reading—despite the fact that there are numerous other industry

7    techniques for dealing with censored dialogue.

8    f.  <u>SETTING</u>:  Both shows take place in a generally comfortable, cloistered,

9    house environment (with an accompanying spa/pool area) extensively

10    wired for video and audio eavesdropping (including one-way mirrors),

11    and both shows use an outdoor (or appearing to be outdoor) space for

12    staging challenges among the contestants.  Because the settings are

13    identical, the contestants in both shows interact with the house in the

14    exact same ways:  for example, they hang out informally in the kitchen,

15    retreat to bedrooms in small cliques to conspire, lament, or whine, go to a

16    big arena-style area to compete in challenges, and relax in the pool/spa.

17    In addition, both shows use a distinct, alarm-like sound to summon

18    contestants to the living room for an announcement given by a female

19    voice.

20    g.  <u>PACE</u>:  With approximately 50 cameras available for back-and-forth

21    cutting, both shows move quickly through a mix of soap opera and

22    splashy contests among the contestants.  Both shows use the same

23    number of contestants, opening recaps, closing evictions, spicy

24    showmances, big splashy competitions, and a female voice that summons

25    the contestants to the living room in a way that interrupts contestant mini-

26    dramas or breaks up narrative lulls.

27    h.  <u>SEQUENCE OF EVENTS</u>:  In an episode of *Glass House*, contestants

28    (i) find out who has been evicted based on their nominations and react to

Gibson, Dunn &
Crutcher LLP

1   the news, (ii) learn which contestants will become team captains, (iii)

2   compete to determine who is next eligible for nomination and

3   elimination, (iv) strategize about whom to nominate for eviction, and then

4   (v) vote on who should be nominated for eviction.  Each of these events

5   has a parallel and appears in the same general order in an episode of *Big*

6   *Brother*.  For example, in the formula for a typical *Big Brother* "Sunday

7   Show," the contestants (i) react to the previous eviction, (ii) react to the

8   "Head of Household" moving in, (iii) compete to determine which

9   contestants get perks or penalties (which generally affects which

10   contestants are nominated for eviction), (iv) strategize about whom to

11   nominate for eviction, and then (v) vote on who should be nominated for

12   eviction.

13   89.    Although both *Big Brother* and *Glass House* are "reality" television, for a

14   variety of reasons the content that appears online and in broadcast episodes actually

15   results in large part from the shows' creative teams.  The producers make a multitude

16   of creative choices that ultimately drive the story and the shows' creative expression

17   including, for example, intentionally casting certain character types and personalities,

18   putting specific constraints on the contestants to heighten drama or conflict (*e.g.*

19   decreeing that contestants will share a bed, determining what items are available to the

20   contestants inside the house, and creating the competitions), deciding the rules of the

21   game, and using plot "twists" to influence the contestants' behavior.  In addition,

22   neither show merely airs footage from the previous few days.  Instead, producers

23   record numerous hours of footage and make conscious decisions in post-production

24   about how to edit or cut footage in a way that creates the desired storyline and

25   narrative.  To put it more simply, producers of both shows exert great control at both

26   the front and back end of the production process and thereby craft the type of program

27   they desire.  This selection, coordination, and arrangement of the show's elements, by

28   the creators, constitutes protectable expression.

90.     *Big Brother* and *Glass House* also share a unique *combination* of elements, an expression invented and pioneered by *Big Brother*. This expression includes, but is not limited to, the fact that both shows are reality television competitions in which approximately a dozen non-celebrity individuals of mixed gender and ethnicity live in a large studio-bound "house," physically isolated from the outside world; that the occupants form strategic alliances in an effort to win perks and survive eviction votes; that the narrative is an unfolding dramatic story; that the last contestant remaining wins a fixed figure prize; and that viewer input online and via text messages impacts the unpredictable, constantly evolving narrative.

91.     This expression did not exist before *Big Brother* and was not replicated in toto until *Glass House*. There are no other television series in the current or prior art that share the unique combination of creative elements and program-specific production challenges found in both *Big Brother* and *Glass House*. Indeed, no other show (other than *Big Brother* and *Glass House*) involves contestants living in a studio-bound house isolated from the outside world where the dramatic narrative flows from footage that is shot and edited before the season is complete, and hours of live footage are simultaneously broadcast on an internet feed—let alone involves the many other characteristics that *Glass House* and *Big Brother* have in common.

92.     *Glass House* has numerous other characteristics and expressive elements in common with *Big Brother*, including that:

      a. In both shows, viewers use interactive features to provide input into the show.

      b. Both online and through their social networks, viewers of both shows are encouraged to support and follow the contestants they like.

      c. Viewers of both shows can watch a live online feed of the players and vote to decide things like what players wear and eat.

d. Both shows involve a "return" element where the audience may vote to have eliminated contestants re-enter the house—an element copied from approximately five past seasons of *Big Brother*.

e. The concept of contestants living in a transparent glass house is a variation of the *Big Brother* franchise, *Big Brother Second Life*—a virtual version of the show that debuted on the internet in 2006—where contestants were challenged to spend a minimum of eight hours a day in a transparent house and where contestants lived in five see-through apartments.

f. In both shows, contestants interact with producers and reveal details about their experience in a "diary room" or a "confession room."

g. The "house" featured on both shows is set up so that some contestants are forced to sleep in the same bed, which adds conflict and intrigue to the show.

h. *Glass House* uses a "video wall" that communicates instructions, rules, or edicts to the contestants in a computerized voice. This is the same as the narrator on *Big Brother*, who communicates with the contestants via a monitor in the house, and similar to instances where a *Big Brother* contestant called the "Saboteur" communicated with the *Big Brother* contestants via a video monitor.

i. The decor, color scheme, and layout of the house on *Glass House* are virtually identical to the setting of *Big Brother*.

j. Both shows focus on contestant dialogue or interactions in, among other places, a spa or pool area.

k. In the first episode of *Glass House*, viewers were introduced to a contestant who would become the self-described "worst villain in this history of reality television" and whose purpose was to terrorize the other contestants according to the viewers' wishes. This concept is duplicative

1   of the *Big Brother*'s "saboteur"—a contestant who wreaked havoc on the

2   other *Big Brother* contestants by performing acts requested by the

3   viewing public.

    1.   Although in most seasons of *Big Brother* the contestants vote to

5   determine who is evicted, CBS is informed and believes that *Glass*

6   *House*'s use of viewer votes to determine contestant elimination is copied

7   directly from the premiere season of *Big Brother*, which used the same

8   viewer-vote format.

9   93.   In addition, the version of *Glass House* that streams live on the internet

10   has the same look and feel as the *Big Brother* online feed and the live *Big Brother*

11   footage that airs on Showtime.  Among other things, *Glass House*'s online feed uses

12   the same camera angles, follows the same narrative and topics of discussion, shoots in

13   the same setting, employs the same costuming, and uses the same production

14   techniques as are used on *Big Brother*'s live-streaming broadcasts.  As a result, the

15   expression in *Glass House*'s online feed is virtually identical to that in *Big Brother*'s

16   live-streaming versions.

17   94.   The television broadcast version of *Glass House* also has the same look

18   and feel as the episodes of *Big Brother* broadcast on CBS Television Network.

19   Among other things, the shows use the same camera angles, follow the same narrative

20   and topics of discussion, shoot in the same setting, employ the same costuming, and

21   use the same production techniques.  As a result, the expression in *Glass House*'s

22   broadcast episodes is identical to that in the version of *Big Brother* that broadcasts on

23   CBS Television Network.

24   95.   On information and belief, the similarities between *Glass House* and *Big*

25   *Brother* are not accidental.  *Glass House* was not independently created by anyone

26   affiliated with Defendants but instead was purposefully intended to be a copy of *Big*

27   *Brother* in order to capitalize on *Big Brother*'s success and to harm a successful,

28   established series belonging to a rival network.

Gibson, Dunn &
Crutcher LLP

28

## Defendants Misappropriated CBS's Trade Secrets

96.     In addition to copying *Big Brother*'s creative expression, Defendants have also misappropriated *Big Brother*'s valuable production trade secrets to produce *Glass House*. CBS is informed and believes that the former producers and staff of *Big Brother* who are now working for Defendants on *Glass House* have divulged to Defendants and their producers and staff the compilations, devices, methods, techniques, and/or processes identified in the attached appendix (the "*Big Brother* trade secrets"), as well as other confidential information they acquired during their time working on *Big Brother*.

97.     CBS is further informed and believes Defendants have used and intend to continue using these *Big Brother* trade secrets in connection with their production of *Glass House*.

98.     For example, former *Big Brother* employees were given copies of the "House Guest Manual," "Producer's Binder," "Story Producers Handbook," and/or "Switcher Manual" — four critically important documents that reveal highly confidential and proprietary trade secrets about how *Big Brother* is produced—in connection with their work on *Big Brother*. The House Guest Manual contains, among other things, details about how the *Big Brother* production staff interacts with contestants. *See* Appendix A. The Producer's Binder sets forth the style guide, show formats, planning and executing of the show, and a compilation of various reference materials for producers. *See id.* The Story Producers Handbook, among other things, sets forth the processes *Big Brother* uses to produce the show on such a tight timeframe. *See id.* The Switcher Manual, among other things, details the unique role that switchers play in the *Big Brother* production processes, including Master Control Room protocols to which switchers are required to adhere, and the way in which switchers interact with other crew members. CBS is informed and believes that the former *Big Brother* employees have used these documents during their work on *Glass House* and that they have communicated their contents to other employees of *Glass*

Gibson, Dunn & Crutcher LLP

*House.* Some or all of these manuals also provide further detail concerning CBS's

trade secret Nos. 2-13 and therefore qualify as compilations of those trade secrets. *See*

Appendix A.

99. Among other things, CBS is informed and believes that Defendants were

involved in the following specific acts of misappropriation, among others:

    a. Former *Big Brother* employee and *Glass House* show-runner Kenny
Rosen showed a *Big Brother* Master Control Room schedule to *Glass
House* employee Marie Mitchell and consulted the schedule in order to
determine how many story-production employees to hire on *Glass House.*

    b. Former *Big Brother* employee and *Glass House* show-runner Kenny
Rosen disclosed the *Big Brother* HouseGuest Manual to *Glass House*
employee Tom Friedman, asking Mr. Friedman to type it up for use on
*Glass House.* Mr. Friedman then sent the "typed up" version to a lawyer
associated with *Glass House* named Laura Icken. Mr. Rosen and Mr.
Friedman took these actions in order to copy the *Big Brother* HouseGuest
Manual and to benefit from the resources and trial-and-error *Big Brother*
invested in its creation.

    c. Defendants actually used a contestant manual on *Glass House* that was
largely plagiarized from the *Big Brother* HouseGuest Manual.

100. Moreover, given that, among other things, Defendants hired at least 32

former *Big Brother* employees, CBS is informed and believes that Defendants hired

these individuals as part of a calculated effort to obtain and exploit the valuable trade

secrets and confidential information to which these individuals have access by virtue

of their past work on the successful *Big Brother* series, and specifically, their

possession of the above-mentioned manuals and other confidential *Big Brother*

documents reflecting CBS's trade secrets. Indeed, Ms. Henson (who is an ABC

executive) herself signed an NDA when she worked on *Big Brother,* had extensive

1  knowledge of CBS's trade secrets, and, on information and belief, recruited former

2  *Big Brother* employees to exploit those trade secrets.

3     101.  CBS is informed and believes that, during the very short timeframe *Glass*

4  *House* was actually in development, it would have been impossible for Defendants to

5  have independently created the production processes (which CBS developed over 13

6  years and for which CBS initially had to pay valuable consideration) necessary to

7  produce a show where individuals are filmed 24 hours per day by hidden cameras,

8  with very limited interaction between the contestants and production staff, while

9  living in an environment that is physical isolated from the outside world, where live

10  footage is streamed to the internet, and where the captured footage is edited into a

11  narrative before production of the rest of the season is complete and before the

12  producers know how the contest will turn out.

13     102.  Moreover, CBS is informed and believes that an executive at ABC, Tim

14  Bock, said to individuals associated with *Big Brother* that the specific purpose of

15  hiring so many former *Big Brother* employees was to improve *Glass House* and to

16  diminish the value of *Big Brother*.

17     103.  *Glass House* is now in production and broadcasting episodes, and, on

18  information and belief, now is precisely when CBS's trade secrets and confidential

19  information are most valuable to *Glass House*.  CBS is informed and believes that *Big*

20  *Brother*'s trade secrets and confidential information are now being disclosed and put

21  to use on *Glass House* daily.

### IV. FIRST CAUSE OF ACTION

### (Copyright Infringement)

24     104.  CBS repeats and incorporates by reference the allegations in paragraphs 1

25  through 103 above, as if fully set forth herein.

26     105.  *Big Brother* constitutes copyrightable expression protected by the federal

27  Copyright Act, 17 U.S.C. § 101, *et seq.*

28

106.   As the exclusive U.S. licensee of *Big Brother* and under 17 U.S.C. §§ 106 and 501, CBS is a legal or beneficial owner of the exclusive rights to reproduce *Big Brother* in copies, prepare derivative works based upon the copyrighted work, distribute copies of the copyrighted work, and display and perform the copyrighted work publicly.

107.   CBS is informed and believes, and on that basis alleges, that due to, among other things, the fact that the most senior positions and critical functions on *Glass House* are led and staffed with former producers and staff from *Big Brother*, who were exposed to numerous confidential and proprietary aspects of the development, filming, and production of *Big Brother* and who signed non-disclosure agreements in connection with their work on *Big Brother*, Defendants have a high degree of access to CBS's copyrighted work and expression.

108.   Both the online and broadcast versions of *Glass House* employ the same plot, themes, mood, setting, pace, characters, sequence of events, and other concrete elements making up *Big Brother* and therefore are substantially and strikingly similar to *Big Brother*, and the look and feel of the two shows is also substantially similar.

109.   CBS is informed and believes, and on the basis alleges, that, in connection with the development of *Glass House*, Defendants have copied and intend to continue copying *Big Brother*, and the expression contained therein, without CBS's or any other copyright holder's license, authority, or consent.

110.   By broadcasting the infringing work *Glass House*, Defendants have distributed copyrighted elements of *Big Brother*, and the expression contained therein, to the public, performed and displayed the copyrighted work publicly, and created a derivative work based on *Big Brother* without CBS's or any other copyright holder's license, authority, or consent.

111.   By engaging in the conduct described above, Defendants have committed and continue to commit copyright infringement under the federal Copyright Act, 17 U.S.C. §§ 101 *et seq.*

112.   Defendants' copying of *Big Brother* without CBS's or any other copyright holder's license, authority, or consent and in violation of non-disclosure agreements of former producers and other staff from *Big Brother* is a willful and conscious disregard of CBS's rights under the federal Copyright Act.

113.   As a direct and proximate result of Defendants' infringement of CBS's copyright interests in *Big Brother*, CBS has been damaged and continues to be damaged in an amount to be determined at trial. CBS is also entitled, under 17 U.S.C. § 504(a), to statutory damages, to the extent they exceed CBS's actual damages, for each of Defendants' acts of infringement.

114.   In infringing CBS's copyright interests, Defendants acted willfully and maliciously, entitling CBS to enhancement of any statutory damages, pursuant to 17 U.S.C. § 504(c)(2), in an amount to be determined at trial.

115.   As a direct and proximate result of Defendants' infringement of CBS's copyright interest in *Big Brother*, Defendants have made or will make profits attributable to their infringement. The amount of these profits will be determined at the time of trial.

116.   As a direct and proximate result of Defendants' willful infringement of CBS's copyright interests, CBS is entitled to appropriate relief pursuant to 17 U.S.C. § 505.

117.   CBS has been and will continue to be damaged as a direct and proximate result of Defendants' continuing acts of infringement and threatened infringement, including but not limited to, lost revenues and profits, damaged relations with existing and prospective business partners, loss of goodwill, and continuing loss of value of its copyright interests in *Big Brother*. Indeed, when *Big Brother* now attempts to grow its already existent online features, some industry press are now reporting that it is CBS who is "rob[bing]" *Glass House*. The damages that CBS has suffered and continues to suffer from this infringement are irreparable. CBS has no adequate remedy at law, and

1   such conduct will continue to cause irreparable harm unless restrained by this Court

2   by the issuance of a preliminary injunction.

3       118.   Unless enjoined by this Court, Defendants' conduct and continued

4   infringement of CBS's copyright interests will cause further irreparable injury. CBS

5   therefore requests that, after trial, this Court issue a permanent injunction, restraining

6   and enjoining Defendants and their agents, employees, attorneys, representatives, and

7   anyone acting at their direction or behalf from copying, reproducing, distributing,

8   displaying, performing, or creating derivative works based on the copyrightable

9   expression in *Big Brother* without the express or implied consent of CBS.

10       119.   To prevent ongoing and future infringement of CBS's copyright interests

11   and the irreparable injury resulting therefrom, CBS requests that this Court order

12   Defendants to surrender all copies made in violation of CBS's copyright interests, as

13   well as any film negatives, tapes, or other articles by which such copies may be

14   produced, and the destruction or reasonable disposition of all such items as part of its

15   final judgment in this action.

## V. SECOND CAUSE OF ACTION

### (Trade Secret Misappropriation)

18       120.   CBS repeats and incorporates by reference the allegations in paragraphs 1

19   through 119 above, as if fully set forth herein.

20       121.   CBS jointly developed and is an owner of valuable, confidential, and

21   proprietary trade secrets, described in paragraphs 34 through 41 and in the

22   accompanying appendix, embodying compilations, devices, methods, techniques,

23   and/or processes of the developing, filming, and producing *Big Brother*.

24       122.   These confidential compilations, devices, methods, techniques, and/or

25   processes are not generally known to the public or others who can obtain economic

26   value from their disclosure and use. In fact, Mr. Rosen, a former Co-Executive

27   Producer of *Big Brother*, who now is the show runner for *Glass House*, has conceded

28   that when he first started working on *Big Brother*, the show was different in every

1    regard from other shows he had worked on due to the nature of the show and how it
2    was filmed—*i.e.*, a reality TV show monitoring people living in a house, playing a
3    competition that was being broadcast while still being taped. CBS has expended
4    considerable time, money, and labor in the development of these trade secrets over the
5    last 13 seasons of *Big Brother* and derives independent economic value (actual and
6    potential) from the fact that they are not generally known. For example, the manuals,
7    which are compilations of *Big Brother* trade secrets, have economic value because
8    they can be used to pitch the show (format) to possible licensees. They are valuable
9    because the entire format of the show, and all the confidential, proprietary processes
10   utilized to create the show, are laid out in the manuals and a potential licensee could
11   simply use the manuals to replicate the show without having to undergo years of trial
12   and error (already undertaken by CBS) to produce the show.

13       123.   CBS takes regular and reasonable steps to maintain the confidentiality of
14   its trade secrets, including those involved in the development, filming, and production
15   of *Big Brother*. At all relevant times, CBS has vigilantly protected its trade secrets by
16   not permitting or allowing any confidential or proprietary information to be accessed
17   or used by anyone without a duty and obligation to CBS to maintain the secrecy
18   thereof. In the case of *Big Brother*, CBS and its business partners, among other things
19   described in paragraphs 34 through 41 above, required individuals working on the
20   show to sign non-disclosure agreements expressly prohibiting them from disclosing or
21   exploiting CBS's Confidential Information, as a condition of working on the show.
22   These NDAs must be signed before individuals receive copies of the Manuals that
23   comprise compilations of the *Big Brother* trade secrets—*i.e.*, the *Big Brother* Story
24   Producers Handbook and the *Big Brother* Producer's Binder (which includes a copy of
25   the *Big Brother* House Guest manual). Additionally, as described in Appendix A, the
26   House Guest Manual contains several strict prohibitions against the disclosure of
27   information contained therein. Moreover, virtually every page of the Story Producers
28   Handbook is stamped as confidential.

Gibson, Dunn &
Crutcher LLP

124.   The trade secrets described in paragraphs 35 through 41 and in the accompanying appendix cannot be ascertained merely by watching the television show *Big Brother*, taking a short guided tour of the *Big Brother* set, or from anything CBS has made publicly available.  Moreover, no tours are taken inside the post-production offices.

125.   CBS is informed and believes, and on that basis alleges, that Defendants unlawfully acquired knowledge of CBS's trade secrets from former employees of *Big Brother*, in violation of those individuals' non-disclosure agreements, and has used and continues to use those trade secrets during the development and production of *Glass House*.  Specifically, the individuals identified in paragraphs 43 through 83 above all signed non-disclosure agreements, and because of this and their work on *Big Brother*, knew or should have known that all *Big Brother* staff signed such non-disclosure agreements.  Therefore, the individuals identified in paragraphs 43 through 83 knew or should have known that each former *Big Brother* staff member they attempted to hire had an obligation to maintain the secrecy of the *Big Brother* trade secrets.  Furthermore, because Corie Henson is a former CBS employee and Supervising Producer on *Big Brother* and is presently ABC's Vice President of Alternative Programming, ABC also knew or should have known that each former *Big Brother* staff member it attempted to hire had an obligation to maintain the secrecy of the *Big Brother* trade secrets.

126.   CBS is informed and believes that executives of ABC must approve the hiring of anyone working on *Glass House* who holds a co-executive producer level position or higher, which would include, but not be limited to Kenny Rosen and Rebekah Fry.

127.   CBS is informed and believes that *Glass House* is now in production and that now is precisely when CBS's trade secrets and confidential information are most valuable to *Glass House*.  CBS is informed and believes that those trade secrets and

1    confidential information are now being disclosed and/or put to use on *Glass House*

2    daily.

3        128.   By engaging in the conduct described above, Defendants have

4    misappropriated CBS's trade secrets in violation of the Uniform Trade Secrets Act,

5    California Civil Code §§ 3426 *et seq.*

6        129.   CBS is informed and believes, and on that basis alleges, that Defendants

7    knew the disclosure and acquisition of CBS's trade secrets was a violation of the non-

8    disclosure agreements and, therefore, that Defendants' misappropriation is knowing

9    and willful.

10       130.   As a direct and proximate result of Defendants' misappropriation of

11   CBS's trade secrets, CBS has been damaged and continues to be damaged in an

12   amount to be determined at trial.

13       131.   As a direct and proximate result of Defendants' misappropriation of

14   CBS's trade secrets, Defendants have been or will be unjustly enriched.  The amount

15   of this unjust enrichment will be determined at the time of trial.

16       132.   As a direct and proximate result of Defendants' willful and malicious

17   misappropriation of CBS's trade secrets, CBS his entitled to appropriate relief

18   pursuant to California Civil Code § 3426.4.

19       133.   In misappropriating and using CBS's confidential and trade secret

20   information, Defendants acted willfully and maliciously, entitling CBS to have its

21   damages, and unjust enrichment, doubled pursuant to California Civil Code

22   § 3426.3(c) as exemplary damages, in an amount to be determined at trial.

23       134.   CBS has been and will continue to be damaged as a direct and proximate

24   result of Defendants' continuing acts of misappropriation and the continued and

25   threatened misappropriation and disclosure of CBS's trade secrets, including but not

26   limited to, lost revenues and profits, damaged relations with existing and prospective

27   business partners, and continuing loss of value of its trade secrets.  The damages that

28   CBS has suffered and continues to suffer from such conduct are irreparable.  CBS has

1    no adequate remedy at law, and such conduct will continue to cause irreparable harm

2    unless restrained by this Court by the issuance of a preliminary injunction.

3        135.   Unless enjoined by this Court, Defendants' conduct and continued use of

4    misappropriated trade secrets will cause further great and irreparable injury.  CBS

5    therefore requests that, after trial, this Court issue a permanent injunction, restraining

6    and enjoining Defendants and their agents, employees, attorneys, representatives and

7    anyone acting at their direction or behalf from misappropriating, using, or disclosing,

8    without the express consent of CBS, CBS's proprietary information and trade secrets,

9    including but not limited those involved in the development, filming, and production

10   of *Big Brother*.

## VI. THIRD CAUSE OF ACTION

### (Inducing Breach Of Contract)

13       136.   CBS repeats and incorporates by reference the allegations in paragraphs 1

14   through 135 above, as if fully set forth herein.

15       137.   *Big Brother* employees sign valid and binding non-disclosure agreements

16   prohibiting them from, among other things, disclosing or exploiting the trade secrets

17   and other confidential information they learn while working on *Big Brother*.

18       138.   CBS is informed and believes, and on that basis alleges, that Defendants

19   knew of the existence of these non-disclosure agreements because, among other

20   things, Corie Henson, a former CBS employee and Supervising Producer on *Big

21   Brother*, who is presently ABC's Vice President of Alternative Programming, signed

22   several of these non-disclosure agreements during her tenure at *Big Brother* and

23   therefore knew or should have known that all other *Big Brother* staff members also

24   had signed these non-disclosure agreements.  Furthermore, because these non-

25   disclosure agreements  are customary in the entertainment industry and Defendants

26   use similar non-disclosure agreements in connection with their own development of

27   television programming and motion pictures, Defendants knew, or should have known

28   of their existence and the *Big Brother* staff's obligations thereunder.

1    139.   CBS is informed and believes, and on that basis alleges, that in

2    connection with the development of *Glass House*, Defendants intended to cause, and

3    in fact caused, former *Big Brother* employees employed on *Glass House* to breach

4    their non-disclosure agreements by encouraging them to create a show based on the

5    unique format of *Big Brother* and thereby to disclose CBS's trade secrets and other

6    proprietary and confidential information and methods to Defendants for use on *Glass*

7    *House*.

8    140.   Moreover, CBS is informed and believes, and on that basis alleges, that

9    Defendants knew that their actions would induce a breach of contract, because, in

10   practical terms, it is impossible for signatories to the *Big Brother* non-disclosure

11   agreements to develop or produce a show as similar to *Big Brother* as *Glass House* is

12   in the very short time period in which *Glass House* has been created without referring

13   to, relying on, or otherwise using *Big Brother*'s trade secrets and thereby breaching

14   their contractual obligations not to disclose or utilizing protected information.  Indeed,

15   *Glass House's* show runner already has admitted to such use as described above in

16   paragraph 99.

17   141.   As a direct and proximate result of Defendants inducing former *Big*

18   *Brother* producers and staff to breach their non-disclosure agreements, CBS has been

19   damaged in an amount to be proved at trial.

20   142.   This knowing and purposeful disregard for CBS's rights under the non-

21   disclosure agreements is oppressive and malicious.  CBS is informed and believes,

22   and on that basis alleges, that officers, directors, or managing agents of Defendants

23   either had advance knowledge of these oppressive and malicious acts and consciously

24   disregarded them or authorized, ratified, or perpetrated the oppressive and malicious

25   acts themselves.  As a result of such conduct, CBS is entitled to punitive damages

26   pursuant to California Civil Code § 3294 in an amount to be proved at trial.

27

28

Gibson, Dunn &
Crutcher LLP

# VII. FOURTH CAUSE OF ACTION

## (Inducing Breach Of Fiduciary Duty)

143.   CBS repeats and incorporates by reference the allegations in paragraphs 1 through 142 above, as if fully set forth herein.

144.   By virtue of their non-disclosure agreements and the trust and confidence CBS reposed in them in entrusting its trade secrets and other confidential and proprietary information to them, *Big Brother*'s former employees owed CBS a fiduciary duty not to disclose the trade secrets and confidential information they learned while working on *Big Brother*.

145.   CBS is informed and believes, and on that basis alleges, that Defendants knew of the existence of the non-disclosure agreements and of the former *Big Brother* employees' fiduciary duty to CBS.

146.   CBS is informed and believes, and on that basis alleges, that in connection with the development of *Glass House* Defendants intended to cause, and in fact caused, these individuals to breach this fiduciary duty by encouraging them to disclose CBS's trade secrets and other confidential information to Defendants for use on *Glass House*.

147.   Moreover, CBS is informed and believes, and on that basis alleges, that Defendants knew that their actions would induce these individual to breach their fiduciary duties, because, in practical terms, it was impossible for Defendants to develop or produce a show as similar to *Big Brother* as *Glass House* is in the very short time period in which *Glass House* has been created without referring to, relying on, or otherwise using *Big Brother*'s trade secrets and thereby breaching the fiduciary obligations not to disclose or utilizing protected information owed to CBS by signatories to the *Big Brother* non-disclosure agreements.  Indeed, *Glass House's* show runner already has admitted to such use as described above in paragraph 99.

Gibson, Dunn &
Crutcher LLP

40

148.   As a direct and proximate result of Defendants inducing the former *Big Brother* employees to breach their fiduciary duties, CBS has been damaged in an amount to be proved at trial.

149.   This knowing and purposeful disregard for CBS's rights is oppressive and malicious. CBS is informed and believes, and on that basis alleges, that officers, directors, or managing agents of Defendants either had advance knowledge of these oppressive and malicious acts and consciously disregarded them or authorized, ratified, or perpetrated the oppressive and malicious acts themselves. As a result of such conduct, CBS is entitled to punitive damages pursuant to California Civil Code § 3294 in an amount to be proved at trial.

## VIII. PRAYER FOR RELIEF

WHEREFORE, CBS prays for the following relief:

A.   That the Court enter judgment in favor of CBS and against Defendants;

B.   That the Court enter a declaratory judgment that Defendants have committed copyright infringement in connection with their development of *Glass House*;

C.   That pursuant to California Civil Code Section 3426.2 and other applicable authorities, Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them, be preliminarily and permanently restrained and enjoined from misappropriating, disclosing, or using CBS's confidential information and trade secrets, and from infringing CBS's copyright interests;

D.   That Defendants be ordered to recall and surrender all copyrighted material and trade secrets wrongfully misappropriated or converted;

E.   That CBS recover compensatory damages for Defendants' wrongdoing in an amount to be established at trial, together with pre-judgment and post-judgment interest thereon at the maximum legal rate;

Gibson, Dunn &
Crutcher LLP

1    F.    That CBS recover its proven damages or statutory damages elected in

2    accordance with the Copyright Act, 17 U.S.C. §§ 504 and 505 and other applicable

3    law.

4    G.    That CBS recover an award of punitive and other appropriate exemplary

5    damages, disgorgement, restitution, pre-judgment and post-judgment interest as

6    permitted by statute and/or contract, including but not limited to California Civil Code

7    Section 3426.3;

8    H.    That pursuant recover appropriate relief pursuant to 17 U.S.C. § 505 and

9    California Civil Code § 3426.4; and

10    I.    Such other and further relief as this Court may deem just and proper.

11   DATED:  July 30, 2012

SCOTT A. EDELMAN
THEANE EVANGELIS KAPUR
ANGELIQUE KAOUNIS
BLAINE H. EVANSON
MICHAEL SEITZ
GIBSON, DUNN & CRUTCHER LLP

By: _____
Scott A. Edelman

Attorneys for CBS BROADCASTING INC.,

1

# IX. JURY DEMAND

2          CBS demands a trial by jury.

3

4     DATED:   July 30, 2012

5                                    SCOTT A. EDELMAN
                                     THEANE EVANGELIS KAPUR
6                                    ANGELIQUE KAOUNIS
                                     BLAINE H. EVANSON
7                                    MICHAEL SEITZ
                                     GIBSON, DUNN & CRUTCHER LLP

8

9                                    By:_____
                                          Scott A. Edelman
10
                                     Attorneys for CBS BROADCASTING INC.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## APPENDIX A

2

3

4

5

6

# HIGHLY CONFIDENTIAL DOCUMENT

7

8

9

10

# FILED UNDER SEAL PURSUANT TO

11

12

# STIPULATED PROTECIVE ORDER

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

## CERTIFICATE OF SERVICE

I, Geri D. Hollins, certify as follows:

I am employed in the County of Los Angeles, State of California; I am over the age of eighteen years and am not a party to this action; my business address is 2029 Century Park East, Los Angeles, California, 90067, in said County and State. I am employed in the office of Michael Seitz, a member of the bar of this Court, and at her direction on July 30, 2012, I served the following document:

## FIRST AMENDED COMPLAINT

on the parties listed on the attached Service List by the following means of service:

**Glenn Pomerantz**
Munger, Tolles & Olson LLP
355 South Grand Avenue, 35th Floor
Los Angeles, CA 90071-1560
Telephone: (213) 683-9100
Facsimile: (213) 687-3702
Glenn.Pomerantz@mto.com

Attorneys for American Broadcasting Companies, Inc., The Walt Disney Company, Disney Enterprises, Inc., ABC, INC., dba Disney/ABC Television Group, and Keep Calm and Carry On Productions, Inc.

**Devin A. McRae**
Early Sullivan Wright Gizer & McRae LLP
6420 Wilshire Blvd., 17th Floor
Los Angeles, CA 90048
Telephone: (323) 301-4660
Facsimile: (323) 301-4676
dmcrae@earlysullivan.com

Attorneys for Corie Henson, Michael O'Sullivan, and Kenny Rosen

☐ **BY MAIL:** I placed a true copy in a sealed envelope addressed as indicated above, on the above-mentioned date. I am familiar with the firm's practice of collection and processing correspondence for mailing. It is deposited with the U.S. Postal Service on that same day in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☑ **BY PERSONAL SERVICE:** I placed a true copy in a sealed envelope addressed to each person[s] named at the address[es] shown and giving same to a messenger for personal delivery before 5:00 p.m. on the above-mentioned date.

Gibson, Dunn & Crutcher LLP

☐   **BY FACSIMILE:** From facsimile machine telephone number (310) 551-8741, on the above-mentioned date, I served a full and complete copy of the above-referenced document[s] by facsimile transmission to the person[s] at the number[s] indicated.

☐   **BY ELECTRONIC MAIL:** On the above-mentioned date, I e-mailed the above-referenced document[s] to the person[s] at the e-mail address[s] indicated.

☐   **BY OVERNIGHT MAIL:** I placed a true copy in a sealed envelope addressed as indicated above, on the above-mentioned date. I am familiar with the firm's practice of collection and processing correspondence for delivery by overnight mail. Pursuant to that practice, envelopes placed for collect ion at designated locations during designated hours are delivered to the overnight mail service with a fully completed airbill, under which all delivery charges are paid by Gibson, Dunn & Crutcher LLP, that same day in the ordinary course of business.

☐   **(STATE)** I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

☑   **(FEDERAL)** I declare under penalty of perjury that the foregoing is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 30, 2012, in Los Angeles, California.

_Geri D. Hollins_

Geri D. Hollins